**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Nicholas T. MOORE and Scott A. Anderson, Defendants–Appellants.**

**Nos. 93–3213 and 93–3214.**

United States Court of Appeals, Seventh Circuit.

Argued April 13, 1994.

Decided June 1, 1994.

---

Richard N. Cox, Asst. U.S. Atty. (argued), Danville, IL, for U.S.

Kevin Colombo, Danville, IL, for Nicholas T. Moore.

Gregory G. Lietz (argued), Hutton, Laury, Hesser, Lietz & Wilcox, Danville, IL, for Scott A. Anderson.

Before BAUER, WOOD, Jr. and CUDAHY, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

On July 16, 1992, Nicholas Moore and Scott Anderson entered the Wagner Credit Union in Decatur, Illinois. Brandishing handguns, they removed over $4,600 from a teller's drawer and swiftly made their escape. They were ultimately indicted for armed robbery of a credit union, in violation of 18 U.S.C. § 2113(a), (d), and using or carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). Following a jury trial both men were convicted on both counts. Moore received a sentence of 46 months imprisonment for the armed robbery and 60 months for the firearm violation. Anderson received a sentence of 51 months imprisonment for the armed robbery as well as 60 months for the firearm offense. Both defendants appeal their convictions. Moore alone appeals his sentence.

## I.

The Wagner Credit Union is a small building with three teller areas at one end of its lobby. On the wall behind the teller area is a video surveillance camera, focused on the teller and lobby areas. Opposite the teller area is a door to the loan office. On the morning of July 16, 1992, Corliss Heckwine, a teller at the Credit Union, was working at the middle teller area. The area to her left was also open but unattended at that time. At approximately 9:15 a.m., two men entered the credit union. They were carrying guns and wearing hoods on their heads, which partially covered their faces. The first robber approached Heckwine and pointed a black gun at her face. She placed her hands in the air and said "Please don't shoot me." He then jumped onto the counter of the unattended teller window to Heckwine's left, reached into the teller drawer and removed some money. The other robber at this time was standing at the loan office door. He had one hand on the door knob and used the other to point a gun at the teller area. After removing the cash, the first robber jumped down from the counter. Both men then left the credit union, having stolen over $4,600.

The video surveillance camera recorded this entire event. The video tape showed that both robbers were carrying objects that resembled handguns, and were not wearing gloves. The tape also showed that the first robber placed his left hand on the counter top at the teller window. The second robber placed his left hand on the loan office door knob. The police used this video tape to help them locate possible areas to search for fingerprints. They took five fingerprints from the loan office door, the counter top, and the front door of the credit union. The Federal Bureau of Investigation examined these prints and compared them to known prints of the defendants. The investigator concluded that the prints from the counter top and the front door were made by Anderson, and the print on the loan office door knob was made by Moore.

For several months before and after the robbery, Moore's "girlfriend" was Julie Jackson. She was at Moore's residence on the morning of the robbery. Moore had asked her to stay to wait for a repairman while he went out. About one and one half hours later Moore returned with Anderson. Jackson saw them counting money which was laid out in small stacks. When Jackson asked where the money had come from, Moore replied that "they had robbed Wagner's Credit Union." Both men indicated that they wanted to watch the news to see if the police had any leads in the robbery. While they waited for the news to come on, Moore instructed Jackson to go to a friend's house to pick up a bag of charcoal. She drove to the friend's house. Anderson's car was parked there. She picked up the bag of charcoal and returned to Moore's home. The friend followed in Anderson's car. When she returned Moore and Anderson took two guns

from the bag, emptied the bullets from the guns and cleaned the guns.

Both Moore and Anderson had been in the Wagner Credit Union before the robbery, although neither of them had accounts there. Anderson was in the day before with his brother, who does have an account there. His brother made some transactions at the window where the robbery occurred. Anderson was standing next to his brother during these transactions. Moore had been in the Credit Union the morning of the robbery. He came in at approximately 8:30 a.m., forty-five minutes prior to the robbery. He approached the teller who was at the window where the robbery occurred and requested a job application. This was recorded by the surveillance cameras. The video tape showed Moore looking around the lobby area. It also showed Moore watching as the head teller placed $3,000 in the teller drawer. After five minutes, Moore left the Credit Union without obtaining the requested application.

Both defendants were convicted of the charged offenses.

## II.

Each defendant was charged with the offenses of: 1) robbery of a credit union by use of a dangerous weapon, in violation of 18 U.S.C. § 2113(a), (d); and 2) using or carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). Conviction of the second offense requires proof that the defendants possessed a "firearm" as that term is defined in the statute. That definition provides, in relevant part, that a firearm is "[a]ny weapon ... which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Conviction under the first statute requires proof of the use of a dangerous weapon, but that weapon need not meet the strict definition of "firearm" from section 921. In fact the dangerous weapon for purposes of the first statute need not be genuine or operable; it may even be a toy. *See United States v. Martinez–Jimenez,* 864 F.2d 664, 666 (9th Cir.), *cert. denied,* 489 U.S. 1099, 109 S.Ct. 1576, 103 L.Ed.2d 942 (1989). This distinction is crucial to many of the defendants' arguments.

### A.

Two witnesses, Corliss Heckwine and Julie Jackson, both testified that they saw the defendants with guns or handguns on the day of the robbery. The defendants raise three points of error with respect to this testimony. First, they contend the witnesses lacked proper foundation to testify that the objects the defendants were holding were firearms. Essentially they claim that the witnesses were not sufficiently knowledgeable in the area of firearms to know, merely by looking, if the objects were capable of expelling projectiles by the action of an explosive. The witnesses, however, never testified expressly that the objects met the statutory definition of a firearm. They never even referred to the objects as firearms. They each testified only to what they personally saw, guns. Heckwine saw guns pointed at her, one of them only a few feet from her face. Jackson also saw the defendants cleaning the guns and removing bullets. Furthermore both witnesses had seen and fired a handgun before. Heckwine had also been robbed before. Jackson had grown up around her father's guns. Therefore both witnesses had a proper foundation to testify that what they saw were handguns. One need not be a firearm expert to testify that he or she has seen somebody carrying a gun, particularly not when that gun is pointed in the witness's face. *See Parker v. United States,* 801 F.2d 1382 (D.C.Cir.1986) (rejecting the argument that testimony concerning a § 924(c) charge must be given by persons knowledgeable about firearms), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 964, 93 L.Ed.2d 1011 (1987).

Prior to trial the defendants filed a motion in limine seeking to exclude any testimony regarding a firearm "that did not comport with the statutory definition of section 921(a)(3)." The district court properly denied that motion. The statutory definition of a firearm in section 921 was only relevant to Counts II and III. Count I of the indictment charged the defendants with robbery of a credit union by means of a dangerous weapon. This crime did not require any proof

that the dangerous weapon involved met the statutory definition of a "firearm." Therefore barring any testimony relating to guns simply because it could not meet the definition of a firearm would have precluded the government from proving its case under Count I and would have been inappropriate.

■ As their third point of error regarding the testimony, the defendants argue that the jury could have been confused by the witnesses and government attorneys using the terms "guns," "handguns," and "firearms" interchangeably. We find that no such confusion could have occurred. First, the witnesses never used the term firearm, only guns and handguns. Second, although the prosecutor referred to the objects as firearms in the opening statement, the jury was properly instructed that those statements were not evidence. Finally, each party clearly articulated the difference between handguns for purposes of Count I and firearms for purposes of Counts II and III. The district court's instructions to the jury also clearly and correctly advised the jury of the definition of a firearm.

### B.

Anderson and Moore both challenge the sufficiency of the evidence supporting their convictions on the armed robbery and firearm charges. This court will uphold a jury verdict if "any rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt, viewing the evidence and every reasonable inference in the light most favoring the prosecution." *United States v. Colonia*, 870 F.2d 1319, 1326 (7th Cir.1989). The government presented ample evidence to convict each defendant on both counts.

### 1. The robbery charge

■ An investigation of the credit union after the robbery revealed fingerprints of both defendants. Furthermore, the testimony of Julie Jackson connected the defendants to the robbery. Defendant Anderson's fingerprints were found on the inside of the front door of the credit union as well as on the teller counter. The surveillance video revealed that the prints on the counter came

from the exact location where the robber placed his hand during the robbery. Anderson claims that because he was in the credit union the day before, with his brother, he must have made the fingerprints then. The jury obviously disagreed. It was permitted to draw the reasonable inference that, because Anderson's fingerprint was found in the location where the robber placed his hand during the robbery, Anderson must have been the robber.

Defendant Moore's fingerprints were found on the loan office door, the same door that the second robber was holding during the robbery. Moore claims that he must have made the fingerprint while he was in the credit union earlier that morning, asking for a job application. That visit was recorded by the video tape, which shows that Moore did not touch the loan office door at that time. The jury was thus reasonably permitted to conclude that Moore left the fingerprint during the robbery. The video tape of Moore's trip to the credit union on the morning of the robbery also showed that he was looking around the credit union. Because he claimed to be seeking a job application, but rather looked all around the area and left before obtaining the application, the jury could reasonably conclude that he was "casing" the area in preparation for the robbery.

Julie Jackson testified that on the morning of the robbery she saw the defendants cleaning guns and counting a large amount of cash. The defendants now argue that Julie Jackson was an incredible witness. This court has said on occasions far too numerous to count that "[t]he credibility of witnesses is peculiarly within the province of the jury and our review of credibility is prohibited absent extraordinary circumstances." *United States v. Noble*, 754 F.2d 1324, 1332 (7th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). "To be incredible as a matter of law, the testimony must be incredible on its face, it must be 'impossible under the laws of nature for the occurrence to have taken place at all.'" *United States v. Hernandez*, 13 F.3d 248, 252–53 (7th Cir.1994) (quoting *United States v. Dunigan*, 884 F.2d 1010, 1013 (7th Cir.1989)).

The testimony of Julie Jackson is entirely plausible under the laws of nature. She testified that the defendants came to Moore's residence after the robbery and counted large sums of money. Jackson asked them where they obtained the money. Moore responded that "they had robbed Wagner's Credit Union."[1] Later they sent Jackson to a friend's house to pick up guns, which they subsequently emptied and cleaned. They both commented that they wanted to watch the news to see if the police had any suspects in the robbery. Nothing about this testimony is incredible on its face and the jury was entitled to accept it. The government thus presented sufficient evidence from which a rational jury could conclude that both defendants were guilty of the armed robbery of the credit union.

### 2. The firearm charge

■ Counts II and III of the indictment charged the defendants with carrying firearms in connection with the robbery of the credit union. For the purposes of this offense a "firearm" is "any weapon ... which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). Although the police did not recover the guns used in the robbery, and the defendants fired no shots, the jury nonetheless viewed sufficient evidence to conclude that the defendants carried firearms. Heckwine testified that the robbers carried guns and pointed them at her. Jackson not only testified that she saw Anderson and Moore with guns but that she saw them empty bullets from the guns and clean them. Furthermore the video tape showed that the objects were guns.

Several other circuits have upheld convictions under section 924(c) based on similar facts. In *Parker,* the defendant robbed a bank with an object that appeared to be a handgun. 801 F.2d at 1383. Although the police never recovered the gun and the robber never fired it during the robbery, two bank employees testified that the object the robber was carrying was a gun. *Id.* After

the jury found him guilty, Parker appealed arguing that the evidence was insufficient because the witnesses did not have adequate familiarity with firearms to know if the objects were firearms within the statutory definition. The court of appeals rejected that argument, concluding that the witnesses need not have any special knowledge about firearms for their testimony to suffice. *Id.* at 1385. In *United States v. Jones,* 907 F.2d 456 (4th Cir.1990), *cert. denied,* 498 U.S. 1029, 111 S.Ct. 683, 112 L.Ed.2d 675 (1991), the court upheld a conviction under this statute based upon testimony from eyewitnesses who were unfamiliar with firearms coupled with bank surveillance photographs. We hold that the bank surveillance video along with the testimony, albeit from witnesses with minimal familiarity with firearms, that the defendants carried guns, and that they removed bullets from and cleaned those guns, was sufficient to allow the jury to infer that the defendants carried firearms as that term is defined in section 921(a)(3).

### C.

The defendants next argue that the jury instructions were confusing and misleading and prejudiced their defense. Specifically they argue that the terms handgun and firearm became interchangeable and in effect rendered meaningless the statutory definition of firearm.

■ The court instructed the jury that the term firearm means "any weapon which will or is designed to expel a projectile by the action of an explosive. A handgun is a firearm." It also instructed the jury that in order to convict the defendants on Counts II and III, the firearm counts, the jury must find that the defendants carried firearms as defined above. The alleged confusion arose in connection with the court's instruction on Count I, the armed robbery. After setting forth the first three elements of that offense, the court discussed the fourth element as follows:

Fourth, the defendant under consideration put in jeopardy the lives of the employees

---

1. The district court admitted this statement only against Moore. This does not, however, change the result in this case. Even absent this admis-sion, the evidence against both defendants was strong enough to support a conviction for the robbery charge.

of the credit union by means of a dangerous weapon, a handgun.

\* \* \* \* \* \*

To prove the fourth proposition under count I, the government must prove beyond a reasonable doubt that the robbery victim reasonably believed that the robber had a dangerous weapon, a handgun. It is not necessary to prove that the handgun was loaded, operable, or genuine or that the robber brandished the weapon in a threatening manner.

■ The defendants suggest that, because in this instruction the court said a handgun need not be operable or genuine and in the previous instruction the court said a handgun is a firearm, the jury could have been misled into believing that a firearm need not be operable or genuine. This argument overlooks the fact that the instruction that the handgun need not be genuine was specifically limited to Count I, the robbery count. Nothing in the instruction even suggested that this instruction was defining "handgun" for every purpose in the case. Quite the contrary, this explanation of a handgun was limited to the "fourth proposition under count I." The jury is presumed to have followed the instructions. *United States v. Scop*, 940 F.2d 1004, 1008 (7th Cir.1991). Therefore we may conclude that the jury did not arbitrarily excerpt an explanatory note about one count of the indictment and apply it to another, separate count. Consequently no confusion could have resulted from the instructions and they were not erroneous.

### D.

After the trial but before sentencing, the government and the defendants learned that Julie Jackson, a government witness, had previously been convicted of Attempted Obstruction of Justice for "knowingly supplying false information" to a police officer. The defendants argue that this information would have been very useful as a tool for impeaching Ms. Jackson, and that by not disclosing it to the defense, the government violated the rule in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady* the Supreme Court held that the prosecution

may not suppress material, exculpatory evidence. *Id.* at 87, 83 S.Ct. at 1196–97. Furthermore, "[s]uppression of impeachment evidence can also give rise to a *Brady* violation." *United States v. Kozinski*, 16 F.3d 795, 819 (7th Cir.1994). The defendants raised this issue before the district court in a motion for acquittal or new trial. The district court held a hearing and determined, among other things, that the government did not have possession or knowledge of the information concerning Ms. Jackson's prior conviction.

■ The defendants do not contest that part of the court's finding; rather, they contend that the prosecutor had a duty to use due diligence to discover this information. We reject that argument. The rule in *Brady* simply does not apply unless the prosecutor had knowledge of the exculpatory information. *Mendoza v. Miller*, 779 F.2d 1287, 1297 (7th Cir.1985) ("[T]he rule requiring prosecutors in criminal proceedings to disclose information is limited to information known to the prosecutors."), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2251, 90 L.Ed.2d 697 (1986). Moreover, "prosecutors are not usually required to seek out information which is not in their possession." *United States v. Romo*, 914 F.2d 889, 898 (7th Cir.1990), *cert. denied*, 498 U.S. 1122, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991). Consequently we hold that there was no *Brady* violation in this case.

### E.

Defendant Moore challenges the application of the Sentencing Guidelines to his case. He argues error in two respects: 1) he should not have received Criminal History points for a prior state court conviction based upon a guilty plea, because he received a sentence of supervision; and 2) the court improperly chose a sentence at the highest end of the guideline range. Neither argument has merit. First, Moore pled guilty to criminal charges in Macon County, Illinois and was sentenced to supervision. He completed that supervision successfully. The district court, when calculating Moore's Criminal History Category, determined that this was a "prior sentence" and added one Criminal History point. *See* U.S.S.G. § 4A1.1(c). The Sentencing Guidelines de-

fine a "prior sentence" as "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere.*" U.S.S.G. § 4A1.2(a)(1). Moore argues that, because he received and successfully completed a sentence of supervision from the Illinois Court, this amounts to a "diversionary disposition" under section 4A1.2(f) of the guidelines and cannot be counted as a prior sentence. That section provides that

> [d]iversion from the judicial process without a finding of guilt (e.g., deferred prosecution) is not counted. A diversionary disposition resulting from a finding **or admission of guilt** . . . is counted as a sentence under 4A1.1(c) even if conviction is not formally entered. . . .

 We have addressed this precise issue before in *United States v. Stowe,* 989 F.2d 261 (7th Cir.1993). In *Stowe,* we quoted the same language as above and held that a sentence of supervision based upon a plea of guilty in an Illinois court counts as a prior sentence. *Id.* at 262–63. Moore concedes the applicability of *Stowe* but suggests that we revisit and overrule that holding. We see no need to do that. Moore's guilty plea "necessarily involve[d] an admission of guilt." *Kozinski,* 16 F.3d at 812. Therefore, following the plain language of section 4A1.2(f), Moore's sentence could not have been a diversionary disposition. The district court properly considered Moore's sentence to be a "prior sentence" and properly computed his Criminal History Category.

 The court correctly arrived at a sentence level of 20. Coupling that with a Criminal History Category of II, the proper guideline range for Moore's sentence was 37–46 months. The court sentenced Moore to 46 months, the maximum in that range. Moore now contends that this was improper. We will not review a sentence imposed within the guideline range "[a]bsent an error of law or misapplication of the guidelines. . . ." *United States v. Solis,* 923 F.2d 548, 551 (7th Cir.1991). Moore argues no such error or misapplication. Rather, he suggests that the court sentenced him based upon information in his Presentence Report that "**may** well have been incomplete or incorrect." Para-

graph 38 of the Presentence Report indicated that charges were pending against Moore in Macon County, Illinois for sexual assault of a 13 year old girl. Moore's counsel suggested at the time of sentencing that it would be improper to consider those charges as they had been dropped months earlier. The court then contacted the Macon County Courthouse and determined that in fact those charges had not been dropped but were still pending. We therefore find no error in the court's consideration of the charges for purposes of determining the sentence.

### III.

The convictions and sentences of the defendants are

AFFIRMED.