**Joey BREWER, Petitioner, Appellee,**

v.

**Clifford MARSHALL, Respondent, Appellant.**

Nos. 96–2321, 97–1207.

United States Court of Appeals, First Circuit.

Heard April 8, 1997.

Decided July 21, 1997.

Ellyn H. Lazar, Assistant Attorney General, Boston, MA, with whom Scott Harshbarger, Attorney General, was on brief, for appellant.

William A. Hahn, Boston, MA, with whom Hahn & Matkov was on brief, for appellee.

Before TORRUELLA, Chief Judge, BOUDIN and LYNCH, Circuit Judges.

LYNCH, Circuit Judge.

Joey A. Brewer, an African American Boston police officer, was charged with the 1988 kidnapping and rape of a fifteen-year-old minority woman. During the jury impanelment for his state court trial, the prosecutor exercised three rounds of his peremptory challenges, including challenges to four black jurors. At the end of these three rounds, and after the prosecutor had announced himself satisfied, defense counsel objected on the ground that the prosecution had purposefully sought to eliminate black[1] jurors. The judge overruled the objection on the ground that it should have been made earlier, and thus did not require the prosecution to meet the merits of the objection. When the prosecution struck a fifth black juror the next day, the defense promptly objected that this peremptory challenge was racially biased. The prosecution presented a nondiscriminatory reason for striking the juror, and the court overruled the objection on the merits. Brewer was convicted, and the conviction was summarily affirmed on appeal by the Massachusetts Appeals Court. The Massachusetts Supreme Judicial Court declined further review. In November 1993, Brewer filed his petition for habeas review.

Seven years after the state trial, a federal district court issued a writ of habeas corpus, requiring Brewer to be retried or released. The court ruled that Brewer had, on the numbers, made a prima facie case that he had been denied his constitutional right to a trial before a jury of his peers, which the state no longer had the evidence to rebut, and thus there was a violation of *Batson v.*

*Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We reverse.

## I.

We recount the factual background in the light most favorable to the verdict. *See Stewart v. Coalter,* 48 F.3d 610, 611 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 153, 133 L.Ed.2d 97 (1995).

While on duty early in the morning of October 22, 1988, Officer Brewer came upon a young woman and her father in a parked car in Franklin Park. The prosecution presented evidence that Brewer ordered the father to leave the area, put the young woman in his police cruiser, drove to another location, and raped her. The father had attempted to follow in his car but could not keep up. After the rape, Brewer drove the victim home and told her to keep quiet. Instead, she immediately told her mother and father, who then reported the rape to the police. After being treated at a hospital, the victim directed police to the scene of the rape.

At the scene, police found half of the girl's school class schedule on the ground. Police logs also indicated that Brewer had failed to respond to four "priority calls" during the time period in which the girl claimed to have been raped. Brewer's story was that he interrupted the father having sexual intercourse with the daughter, ordered the father to leave, and then took the young woman home. Brewer did not arrest the father, seek medical attention for the daughter, or file an incident report.

Brewer was charged with kidnapping and rape, violations of Mass. Gen. Laws ch. 265, §§ 26, 22A. Jury impanelment for Brewer's trial began on December 15, 1989. During the general voir dire, after six jurors had been excused for inability to serve, the trial judge inquired about the race of the victim.[2] The judge expressed concern that neither

---

1. The terms "African American" and "black" are used interchangeably.

2. The court may have been prompted to make such an inquiry by a juror who volunteered during voir dire that he was prejudiced and that when he saw the defendant and the court mentioned rape, he had become upset.

side had requested a voir dire on the issue of race, and asked whether it was an issue in the case. Both the prosecutor and the defense counsel responded that it was not. The judge then continued with the general voir dire.

After excusing five more jurors who were unable to serve, the judge again suspended the proceedings and insisted that defense counsel ask Brewer himself whether he wanted a voir dire on racial bias. The court, at Brewer's request, then proceeded with an individual voir dire on racial and ethnic bias after excusing the thirteen remaining jurors who were unable to serve. The judge asked each juror, out of the presence of other jurors, whether they had any bias or prejudice for or against black persons or persons of Hispanic origin.

At the end of the individual voir dire, one juror had been excused due to racial bias; fourteen of the remaining prospective jurors were seated in the jury box. The first round of peremptory challenges began with the prosecutor, who asked that six jurors be excused. Defense counsel did not object to any of the challenges. The clerk then excused those six jurors.

After six new jurors were seated, a second round of challenges began. The prosecutor made two more peremptory challenges. Defense counsel did not object. These two challenged jurors were excused and then replaced. In the third round, the prosecutor challenged one juror. Again, with no objection from defense counsel, the challenged juror was excused and replaced.

Having challenged nine jurors over three rounds, the prosecutor informed the court and defense counsel at side bar that the Commonwealth stood content. At this point, defense counsel for the first time objected on race grounds, saying that four of the nine prospective jurors who had been excused were black: "We had a fair representation racially of six and now we're down to two."

After initially asking the prosecutor to explain his reasons for making the challenges, the trial court withdrew its request and instructed defense counsel that he should raise his objection to a peremptory challenge "at the time the challenge is made."[3]

Although the defense counsel complained that he had not seen "the pattern emerge until it was completed," he did not create a record of the races of the challenged jurors. The judge continued with the impanelment, giving defense counsel the opportunity to make his own peremptory challenges. Defense counsel's challenges resulted in the exclusion of fourteen more jurors including one man who may have been black,[4] and the exhaustion of the jury pool.

On the second day of jury selection, after the judge excused those unable to serve and asked each of the prospective jurors about racial bias, the state exercised two peremptory challenges. One of the challenged jurors was black. Just after that juror was excused and replaced, Brewer's counsel objected and then specifically identified the number of the black juror at the court's request. The court then, consistent with its prior statement, asked the state to explain why it made the challenge. The state responded that the ju-

---

3. The relevant colloquy went as follows:
POMAROLE (prosecutor): The Commonwealth stands content.
THE COURT: Thank you. Mr. McGee?
McGEE (defense counsel): At the outset, I'd like to object on the record to Mr. Pomarole having taken off four black people from the jury. We had a fair representation racially of six and now we're down to two.
THE COURT: Mr. Pomarole—
POMAROLE: Your honor—
THE COURT:—I'm going to ask you give us the reasons for your challenges.
POMAROLE: Your Honor, I'd like to also say at the outset—your Honor, I believe I've challenged white people as well as black people without respect to gender.

McGEE: He hasn't responded, judge.
THE COURT: I know he hasn't yet, sir.
POMAROLE: I'd have to get my notes, your Honor, with respect to the people that I've challenged.
THE COURT: At this point, Mr. McGee, I'm not going to require Mr. Pomarole to give his reasons. But I put you on notice, Mr. Pomarole, that, should this issue arise again, sir, I am going to ask you to justify your challenge. Mr. McGee, in the future you should raise that, sir, at the time the challenge is made.

4. There was some dispute between the court and defense counsel as to whether this juror was black or Hispanic.

ror had two children roughly the same age as Brewer and therefore might be sympathetic to him. The court rejected the objection. The impanelment then continued with defense counsel making the remainder of his challenges, and the court excused three more jurors.

In the end, only one African American was on the jury panel. This sole black juror was randomly chosen to be an alternate and did not engage in deliberations. In sum, a total of forty-five potential jurors went through the jury box; seven were black.[5] There is no evidence as to the total number of black potential jurors. The government exercised eleven peremptory challenges, five of which were against black venire members. Brewer used one of his seventeen peremptory challenges to strike a black potential juror.

Before trial, Brewer filed a motion to dismiss for prosecutorial misconduct, arguing that the state had failed to disclose material and exculpatory evidence in violation of the rule articulated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Brewer complained that the prosecutor had delayed revealing test results that were inconclusive as to whether semen found in the victim was in fact Brewer's. At a bench conference on the first day of trial, the prosecutor had stated that, if Brewer were to introduce evidence that he was not the source of the semen, the victim would be forced to testify that the source was her boyfriend, with whom she had had sexual intercourse before the rape. Defense counsel argued that the alleged victim's prior unprotected intercourse with her boyfriend was exculpatory for his client, because it suggested that she might have a motivation for fabrication. Counsel asked that if the court refused to dismiss the case, that it order the Commonwealth to disclose the boyfriend's identity. The trial court denied the motion to dismiss and did not order disclo-

sure of the boyfriend's identity on the ground that the Massachusetts Rape Shield Law prohibits the introduction of a victim's sexual history.

On the last day of trial, Brewer presented expert testimony that he was not the source of the semen. He then testified that when he found the victim and her father in the car, she was naked and her father's pants were down, thus suggesting that the father was the source of the semen. The victim testified on rebuttal that she had had unprotected sex with her boyfriend suggesting that the semen was his. Defense counsel objected, saying that he had asked for the boyfriend's name earlier and was now precluded from making a credibility argument. The court declined to revisit the issue. After trial, Brewer had blood samples from the boyfriend tested. The results indicated that the boyfriend was not the source of the semen. Brewer then filed a motion for a new trial based on this "newly discovered" evidence. The motion was denied on the ground that the defendant had already presented expert testimony that he was not the source of the semen.

## II.

Brewer was convicted and sentenced to nine-to-twelve years' imprisonment for rape and three-to-five years for kidnapping, to be served concurrently. He appealed his conviction to the Massachusetts Appeals Court. Prior to a decision on appeal, he filed a motion for new trial with the trial court, arguing, *inter alia*, that the prosecutor had impermissibly used peremptory challenges based on race. The trial court denied the motion.

Brewer filed an appeal from the denial of the new trial motion, which was consolidated with his direct appeal. In response to Brewer's arguments, the state argued that, by waiting to object until after all four jurors

**5.** These figures are based on four assumptions: that the four jurors challenged by the state on day one of jury selection were in fact black, that one of the jurors challenged by the defense on day two of jury selection was black, that one juror challenged by the state on day two was black, and that one alternate juror was black. The race of one juror who was excused during

peremptory challenges because of scheduling problems is unknown. There is no clear record of the race of these jurors.

The Commonwealth questioned petitioner's assertions about the number of African American venirepersons, but not until the federal proceedings. This challenge would have been better received if brought during the state proceedings.

were dismissed, Brewer had failed to object in a timely fashion to the state's disputed peremptories. In a one-and-a-half page opinion, the Appeals Court upheld Brewer's conviction: "Substantially for those reasons set out in the Commonwealth's brief and the trial judge's memorandum of decision in denying the defendant's motion for a new trial, we conclude that there is no basis for disturbing the defendant's convictions."

Brewer filed an application for leave to obtain further appellate review with the Massachusetts Supreme Judicial Court. The request was denied without opinion.

Brewer petitioned for a writ of habeas corpus in the United States District Court for the District of Massachusetts in November 1993. He argued that the prosecution made racially motivated peremptory challenges, thereby violating his Fourteenth Amendment rights to equal protection and due process of law as established in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). He also renewed his claim that the state had withheld exculpatory evidence in violation of the *Brady* rule.

The district court denied relief on the *Brady* claim, but found that Brewer had made a prima facie case of discrimination under *Batson*. The district court gave plenary review to the question of racial discrimination and relied solely on numbers to conclude that a prima facie case was established.

Engaging in its own statistical analysis, the district court concluded that there was a pattern that demonstrated a statistical disparity sufficient to establish a prima facie case of racial discrimination under *Batson*. The district court noted that when Brewer first made a *Batson* objection, the prosecutor had exercised nine peremptories, four of which were used to excuse four out of six black venirepersons. In doing this, the court found that the prosecutor used 44% of his strikes in the first round to excuse 66% of the black persons then impaneled.

There were no statistics available as to the racial composition of the venire which had been found to be unbiased after voir dire or the racial composition of Suffolk County from which the venire was drawn. The district court, however, estimated that 15% of the entire venire was black based on the fact that out of a total of 45 potential jurors who had passed through the box, seven were black. Thus, the court reasoned, the prosecutor's strike rate against blacks in the first round (66%) was several times larger than the population of the blacks in the venire (15%).[6]

Applying the new standard of review outlined in the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132 ("AEDPA"), the court found that the estimated numbers based on the "pattern" of strikes alone constituted a prima facie case of discrimination under "clearly established" Supreme Court law.

The court then ordered an evidentiary hearing to allow the state to offer nondiscriminatory reasons for the challenges. The state was unable, seven years after the trial, to produce any evidence. The prosecutor said that he could not recall the reasons and had long since destroyed his trial notes. The court granted the writ on *Batson* grounds on September 30, 1996, but stayed its issuance to allow for an appeal.

Seeking clarification, the state returned to Suffolk County Superior Court and filed a request for the original trial judge to explain her rulings on Brewer's *Batson* claims. After conducting a hearing, the trial judge issued a memorandum stating that she had rejected the initial *Batson* claim on timeliness grounds. Because the excused potential jurors had already left the courtroom, she was unable to observe their races and demeanors at the time of the objection. She was therefore unable to make a meaningful evaluation of the defendant's claim that the prosecutor had made race-based peremptory challenges.

Based on this response, the state filed a motion for reconsideration in the federal district court, arguing that habeas review was barred by procedural default. The court

---

6. In his appellate brief, Brewer agreed, relying upon the district court opinion, that numbers alone can establish a prima facie case.

found the state's new argument unpersuasive and denied the motion, holding that there was no independent and adequate state ground. The Commonwealth appeals, arguing, *inter alia*, that the district court erred in concluding that there was no procedural default on the *Batson* claim. Additionally, Brewer contends on appeal that the government's failure to disclose, in a timely fashion, the boyfriend's identity deprived him of the opportunity to counter the "boyfriend story" in violation of his constitutional rights to a fair trial and due process of law.

### III.

*The Batson Claim and Limits on Federal Habeas Review Independent And Adequate State Grounds*

■ The state asserts that review is barred under the "independent and adequate state ground" doctrine. Under that doctrine, federal courts sitting to hear habeas petitions from state prisoners are barred from reviewing federal questions which the state court declined to hear because the prisoner failed to meet a state procedural requirement. *Lambrix v. Singletary*, — U.S. —, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997). In such cases, the state judgment is said to rest on independent and adequate state procedural grounds. *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Considerations of comity and federalism bar the federal court's review. *Lambrix*, — U.S. at — – —, 117 S.Ct. at 1522–23 ("A State's procedural rules are of vital importance to the orderly administration of its criminal courts; when a federal court permits them to be readily evaded, it undermines the criminal justice system."). "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 732, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991). Without the "independent and adequate state ground" doctrine, federal courts would be able to review claims the state courts never

had a proper chance to consider. *Lambrix*, — U.S. at —, 117 S.Ct. at 1523.

■ There are, however, exceptions to the bar on habeas review if the prisoner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749–50, 111 S.Ct. at 2565.

■ Here, although the state did not raise the procedural default issue in the federal habeas court until a motion for reconsideration, the district court ruled that it would consider the procedural default argument on its merits, in the interests of comity. As the district court properly noted, it has the authority to consider the procedural default issue *sua sponte*. *Ortiz v. Dubois*, 19 F.3d 708 (1st Cir.1994), *cert. denied*, 513 U.S. 1085, 115 S.Ct. 739, 130 L.Ed.2d 641 (1995); *see also Henderson v. Thieret*, 859 F.2d 492, 493 (7th Cir.1988). Although belated, the Commonwealth did make the argument in the state trial court, and the issue was fully briefed both there and here. The procedural default issue was also squarely presented to the state appellate courts on direct review.

On the merits of the procedural default argument, the district court held: "Because the [Massachusetts] Appeals Court gave no plain statement as to its reasons for upholding the conviction, this Court on habeas corpus review presumes that there [are] no independent and adequate state grounds barring review." The Commonwealth challenges this finding. We start with the doctrine of independent and state grounds, focusing first on the question of independence.

*Independence*

■ Generally, a federal habeas court defers to a state court's articulation of a state law ground for a decision. When the state decision "fairly appears to rest primarily on federal law or to be interwoven with federal law," the federal court presumes there is no independent and adequate state ground for

the decision.[7] *Coleman*, 501 U.S. at 733, 111 S.Ct. at 2555–56 (internal quotation marks and citation omitted). However, that presumption does not apply where, as here, there is no "clear indication that [the] state court rested its decision on federal law." *Id.* at 739–40, 111 S.Ct. at 2559.[8]

The one-and-a-half page summary order of the Massachusetts Appeals Court is the last expression of opinion from the state courts.[9] The final state court word on the matter refers us to the opinion of the trial court and the Commonwealth's state appellate brief. The state appellate court denied the appeal "substantially for the reasons set forth in the Commonwealth's brief and the trial judge's memorandum of decision in denying the defendant's motion for a new trial." In *Coleman*, the state court likewise issued a summary order referring to its consideration of all of the filed papers, including the briefs of the petitioner and the state. The Supreme Court acknowledged that this language raised some ambiguity because the briefs referred to federal claims. *Id.* at 744, 111 S.Ct. at 2561. But the Court held that such ambiguity did not warrant application of a presumption that the state and federal claims were intertwined. *See id.*

The Commonwealth's brief to the Massachusetts Appeals Court argued that the defendant had waived his right to challenge the first four black jurors by not making his challenge in a timely fashion. Additionally, it argued on the merits that striking the fifth black juror did not violate the Constitution.[10]

The trial court's memorandum of decision on Brewer's new trial motion was responsive to the arguments presented in the motion, which rested "primarily on the grounds of newly discovered evidence." Brewer presented only a generalized argument about the exclusion of blacks from the jury in his motion: "Due to challenges from the prosecution, most black jurors were excluded from the jury and none deliberated on the verdict." Brewer's motion did not, on its face, challenge the earlier ruling that Brewer's objection to the prosecution's exercise of peremptories to strike four black venire members was untimely. The order of the state judge denying the new trial motion may appear at first to be somewhat ambiguous because it starts with a statement that the court found no support for the contention that the Commonwealth had improperly excluded blacks from the jury. However, the part of the state court opinion dealing with the jury selection procedures only concerns the challenge by the prosecution of the fifth black juror. There is no discussion of defendant's earlier objection. In his application for leave to obtain further appellate review from the Supreme Judicial Court, Brewer admitted that there was no discussion of the legality of the exclusion of the four prospective jurors in the trial judge's memorandum addressing the new trial motion.

There is certainly reason to believe that the basis for the ruling as to the timing of the objection to the prosecutor's first four peremptories against black jurors was an independent state procedural ground.[11] As a

---

7. There are refinements to that doctrine. If, after deciding a party is procedurally barred from raising a claim, the state court nonetheless reviews the merits for a miscarriage of justice and discusses federal law in that context, that limited review does not undercut the adequacy and independence of the state grounds. *Burks v. Dubois*, 55 F.3d 712, 716 n. 2 (1st Cir.1995); *Tart v. Massachusetts*, 949 F.2d 490, 496 (1st Cir.1991).

8. While a broad reading of the Supreme Court's decision in *Harris*, 489 U.S. 255, 109 S.Ct. 1038, might lead to the conclusion that a presumption that the state court decision rests on federal grounds or on intertwined state and federal ground applies here, *Harris* was limited by the Court's subsequent decision in *Coleman*. *See Coleman*, 501 U.S. at 735–36, 111 S.Ct. at 2557.

9. The Supreme Judicial Court denied Brewer's application for further review without opinion.

10. The state's brief argued as follows:
    The defendant waived his right with respect to the four challenged black jurors because he did not object after each challenge, did not make an offer of proof, did not raise the matter until after the four jurors were excused and left, did not request a hearing and did not say anything at all when addressed by the judge, told that she was not going to ask the prosecutor for reasons and given a chance to reply.

11. When the Commonwealth sought clarification in 1996, the judge who presided over Brewer's state court trial emphasized that her ruling on the objection was a result of the timing of defense counsel's objection.

result, we consider the state's argument that the state appeals court ruling rested on the grounds that the challenge to the exclusion of the first four jurors was not timely made and that the challenge to the fifth black juror was valid under the *Batson* standard.[12]

*Adequacy*

The "adequacy" of this state procedural ground, for federal habeas purposes, is another issue. *Batson* itself declined to decide when an objection must be made in order to be timely and left that matter to be resolved by local law. *Batson*, 476 U.S. at 99–100 & n. 24, 106 S.Ct. at 1724–25 & n. 24. There are no Massachusetts Supreme Judicial Court cases establishing precisely when in the sequence of events an objection to a peremptory challenge must be made.

■ Brewer's challenge rests largely on the ground that state procedural requirements "cannot be permitted to thwart review applied for by those who, in justified reliance on prior decisions, seek vindication in state courts of their federal constitutional rights." *NAACP v. Alabama*, 357 U.S. 449, 457–58, 78 S.Ct. 1163, 1169, 2 L.Ed.2d 1488 (1958). State rules may not procedurally bar a federal court from hearing a *Batson* claim on timeliness grounds if the rule is not "firmly established and regularly followed." *Ford v. Georgia*, 498 U.S. 411, 423, 111 S.Ct. 850, 857, 112 L.Ed.2d 935 (1991). In *Ford*, the Supreme Court declined to honor a procedural bar where the defense counsel had in fact raised the *Batson* issue prior to jury selection.

■ *Ford* made clear that state procedures may not completely preclude the very opportunity to raise constitutional claims. *See also James v. Kentucky*, 466 U.S. 341, 348–52, 104 S.Ct. 1830, 1835–37, 80 L.Ed.2d 346 (1984); *Michel v. Louisiana*, 350 U.S. 91, 93–94, 76 S.Ct. 158, 160, 100 L.Ed. 83 (1955);

*cf. Powell v. Nevada*, 511 U.S. 79, 83–84, 114 S.Ct. 1280, 1283, 128 L.Ed.2d 1 (1994). Brewer argues that requiring a defendant to object to a challenge on the ground of a pattern of racially exclusionary strikes before the pattern emerges raises constitutional issues. For example, he says he should not have had to object to the strike of the first black juror on the ground of a pattern of racial discrimination if he did not see the pattern until the strike of the fourth black juror. If that were what happened in this case, we would have considerable sympathy for the argument. But that is not what happened. As the state trial court said in its clarification memo, any pattern emerged at the latest with the strike of the fourth juror; the defense should have made its objection at that time rather than waiting until later:

> The defendant's counsel could have raised the issue of impermissible peremptories after the Commonwealth indicated a desire at side bar to excuse the first six jurors, or the next two jurors, or the final juror, and before those jurors were excused but not after the Commonwealth said it was content.

There is no constitutional impediment to a state procedural ruling such as the trial judge stated.

■ Even if there is no constitutional impediment to the state procedural rule, the Supreme Court has said that the rule must be "firmly established and regularly followed." *Ford*, 498 U.S. at 423–24, 111 S.Ct. at 857. The Commonwealth relies on Massachusetts' firmly entrenched contemporaneous objection rule. *Commonwealth v. Fluker*, 377 Mass. 123, 385 N.E.2d 256, 261 (1979). In cases where defense counsel fails to make a timely objection, the state does not waive the objection, and the appellate decision rested on that ground, that is "a classic example of a procedural default, and petitioner can

As the court stated to defendant's counsel: "[y]ou should raise that at the *time the challenge is made.*" Tr.1–124 (emphasis added). Because the court was foreclosed from effectively assessing the challenges and could not ascertain whether the reasons were race neutral, the court withdrew its request to have the Commonwealth explain its challenges. The

defendant's claim was rejected on timeliness grounds.

12. It is not necessary that a state court explicitly state that it is resting its decision on state procedural grounds in order for the decision to be deemed to rest on "independent and adequate state grounds." *See Coleman,* 501 U.S. at 735–36, 111 S.Ct. at 2557.

succeed in his habeas case only by showing cognizable cause for, and cognizable prejudice from, his procedural default or, alternatively, by demonstrating that the federal court's failure to address the claim on habeas review will occasion a miscarriage of justice." *Burks v. Dubois*, 55 F.3d 712, 716 (1st Cir. 1995) (failure to object to prosecutor's misstatement of evidence at closing precludes habeas review); *see also Puleio v. Vose*, 830 F.2d 1197, 1199 (1st Cir.1987).

Recognizing the value of contemporaneous objections, this court has itself rejected review of *Batson* claims where defense counsel failed to make timely and adequate objection at trial. In *United States v. Pulgarin*, 955 F.2d 1 (1st Cir.1992), we rejected direct review where the defense counsel had made an aborted attempt at trial to raise a *Batson* claim, saying:

> [C]ontemporaneous objection is especially pertinent as to *Batson* claims, where innocent oversight can so readily be remedied and an accurate record of the racial composition is crucial on appeal.

*Pulgarin*, 955 F.2d at 1. Important institutional concerns are advanced by enforcing the contemporaneous objection rule for *Batson* claims.[13]

The Commonwealth's common law contemporaneous objection rule has a statutory analogue in Rule 22 of the Massachusetts Rules of Criminal Procedure, which requires that an objection be made at the time of the challenged action.[14] The purpose of the ob-

jection requirement of Rule 22 is to ensure that the alleged error is "brought clearly to the judge's attention so that [s]he may squarely consider and decide the question." *Commonwealth v. Mosby*, 11 Mass.App.Ct. 1, 413 N.E.2d 754, 762 n. 4 (1980).

As she stated in her clarification memorandum, the state trial judge felt hampered in her ability to fairly evaluate the objection to the peremptory challenges by the timing and method of the objection. Defense counsel did not refer to the four jurors in question by their juror numbers or other identification, but only said that they were black. At the time of the objection, those jurors had already been excused and had left the courtroom. There is no indication (because defense counsel created no record) of where in the sequence of the prosecutor's nine peremptory challenges these four fell or whether the court or counsel had a clear memory of who those jurors were. Nor did counsel create a record of the race of the jurors. As the trial judge said, working later from her memory:

> The race or ethnicity of the jurors cannot be definitely known. As defendant's counsel stated during impanelment "I have no way to distinguish between Hispanic and black." Tr. 1–125. The court does recall that there were discussions with counsel, on and off the record, concerning the race and ethnicity of various members of the venire.[15]

---

**13.** We note that there may be tactical reasons why counsel may choose to wait before asserting an objection to the other side's peremptory challenge. A party may want a particular black juror challenged by the other side to be excused for his own reasons, but still to claim racial bias. Because the court on a promptly made objection to a challenge may choose, after examination, to seat the juror if the juror is still available, a belated objection made after the juror has left may narrow the range of remedies available to the court. *Commonwealth v. Reid*, 384 Mass. 247, 424 N.E.2d 495, 500 (1981) (trial judge has discretion to fashion remedy, including disallowing challenge, and is not required to dismiss the entire venire). If the juror is no longer physically present, the court's remedial options may then be limited to a mistrial and impaneling a new jury. Enforcement of the contemporaneous objection rule avoids allowing a late-objecting party to have his cake and eat it too.

**14.** Mass. R.Crim. P. 22 provides:

> [I]t is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court, but if a party has no opportunity to object to a ruling or order, the absence of an objection does not thereafter prejudice him.

**15.** Our assumption, *arguendo*, in light of the state's failure to raise it as an issue until late, that seven of the jurors were black does not affect the trial judge's view at the time that there was some dispute as to the racial identity of the jurors and that she would have been assisted on this topic of racial identification had the objection been promptly made.

The trial judge commented that the lateness of counsel's objection—after all the jurors at issue had left—meant that she had "no opportunity to observe the demeanor or appearance or race of the excused jurors or to evaluate meaningfully the Commonwealth's challenges." *See also United States v. Bergodere,* 40 F.3d 512, 517 (1st Cir.1994).

At this general level, there is support for the Commonwealth's argument that this case involves an application of the contemporaneous objection rule. Even before *Batson,* Massachusetts, acting under its own Constitution, prohibited the racial use of peremptory challenges in 1979. *See Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499 (1979). Subsequent cases made it clear that *Soares* challenges had to be made at a time sufficient to "provide[ ] the trial judge and opposing counsel with an opportunity to address the matter. This, in turn ... created a record which was adequate for appellate review." *Commonwealth v. Bourgeois,* 391 Mass. 869, 465 N.E.2d 1180, 1186 n. 11 (1984); *cf. Commonwealth v. Smith,* 404 Mass. 1, 532 N.E.2d 1207, 1209 (1989). *Bourgeois* made the record creation expectation explicit: "A record in which [the prosecution] has not had an opportunity to explain the use of peremptory challenges is inadequate to raise a *Soares* violation." *Bourgeois,* 465 N.E.2d at 1186; *see also Commonwealth v. Colon–Cruz,* 408 Mass. 533, 562 N.E.2d 797, 809 (1990).[16]

In reported Massachusetts cases on peremptory challenges, state trial judges have often observed and questioned the jurors in the course of evaluating the challenges. *See, e.g., Commonwealth v. Latimore,* 423 Mass. 129, 667 N.E.2d 818, 824 (1996); *Commonwealth v. Green,* 420 Mass. 771, 652 N.E.2d 572, 575 (1995); *Commonwealth v. Pania-*

*qua,* 413 Mass. 796, 604 N.E.2d 1278, 1280 (1992); *Commonwealth v. Harris,* 409 Mass. 461, 567 N.E.2d 899, 903–04 (1991); *Commonwealth v. Joyce,* 18 Mass.App.Ct. 417, 467 N.E.2d 214, 218 (1984).[17] This indicates that, in these cases, the objections to the challenges were contemporaneously made. Nonetheless, this leaves the matter of whether the trial judge's procedural ruling is based on "firmly established and regularly followed" rules.

We doubt that the Supreme Court meant that a rule could not be "adequate" unless articulated with the level of specificity Brewer contemplates. We are satisfied that counsel for Brewer was adequately on notice of the general contemporaneous objection rule and of the requirement that a record be created sufficient to support review of a *Batson* claim. That may be enough to satisfy the "adequacy" requirement.

Brewer, for his part, strenuously contends that the trial judge's ruling was not a finding of untimeliness, but a determination, on the merits, that he had failed to make a case of discrimination under *Batson.*[18] We need not conclusively resolve whether the trial court's ruling, viewed as procedural, would constitute an adequate state ground for decision in the sense of being a rule "firmly established and regularly followed." *Ford,* 498 U.S. at 423–24, 111 S.Ct. at 857. Even interpreting the trial judge's ruling in the way Brewer wishes us to, and thereby reaching the merits of his constitutional claim, we find that Brewer's petition is doomed.

*Brewer's Batson Claims*

■ As Brewer urges we do, we view the state trial judge's handling of Brewer's *Batson* claim as a finding on the merits. Brewer's habeas petition nonetheless fails.[19]

---

**16.** Thus this case appears to be distinguishable from others where the defendant could not have been " 'deemed to have been apprised of [the state rule's] existence.' " *See Ford,* 498 U.S. at 423, 111 S.Ct. at 857 (quoting *NAACP v. Alabama,* 357 U.S. 449, 457, 78 S.Ct. 1163, 1169, 2 L.Ed.2d 1488 (1958)).

**17.** Trial courts also consider challenges made to similarly situated non-black jurors, for comparison purposes, in evaluating challenges in the context of claims of racial bias. *Green,* 652 N.E.2d at 577 n. 7.

**18.** Brewer appears to argue that the trial judge found that he made a prima facie case and did not request an explanation. This is a misreading of the record.

**19.** Brewer relies on language in the order denying Brewer's new trial motion:

I find no support in the contention that the Commonwealth improperly excluded minorities from the jury.... There was no showing that the Commonwealth was excluding blacks solely by reason of their group membership.

■ Because the new standard of review for habeas petitions outlined in AEDPA is not applicable to pending non-capital cases like Brewer's, *see Lindh v. Murphy,* — U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997), we apply the habeas standard of review unaltered by AEDPA. Under that standard of review, we review de novo the state court decision. *Martin v. Bissonette,* 118 F.3d 871, 874–75 (1st Cir.1997). Within that standard, deference is given to fact-based determinations of the trial court. 28 U.S.C. § 2254(d) (pre-AEDPA version). Decisions of trial courts regarding *Batson* objections are treated with considerable deference. On direct review, the Supreme Court has described the ultimate *Batson* question—intent to discriminate—"as a pure issue of fact" subject to clear error review. *Hernandez v. New York,* 500 U.S. 352, 364, 369, 111 S.Ct. 1859, 1869, 1871–72, 114 L.Ed.2d 395 (1991) (plurality opinion); *id.* at 372, 111 S.Ct. at 1873 (O'Connor, J., concurring). That same clear error standard applies to rulings on whether the defendant has made a *Batson* prima facie case. *Bergodere,* 40 F.3d at 516 (because a *Batson* determination is particularly fact-sensitive, it will be accepted unless shown to be clearly erroneous). And there is no convincing reason why a more lenient standard should govern pre-AEDPA federal habeas review of state court judgments concerning fact-sensitive *Batson* determinations. *Jones v. Jones,* 938 F.2d 838, 842 (8th Cir.1991).

This deferential approach makes particular sense in the *Batson* context. *See Hernandez,* 500 U.S. at 365, 111 S.Ct. at 1869 (plurality opinion). The trial judge has heard the juror's answers to voir dire questions or bench conferences with the juror (such as the individualized voir dire on race bias conducted in this very case). The trial judge is thus likely to have a much better sense than any appellate panel of whether a particular challenge can readily be explained by some reason other than race or gender—for example, other characteristics of the juror, the juror's demeanor, or something in the juror's background suggesting sympathy for one side or the other. This court has recognized that considerable deference is owed to a trial judge who observes the voir dire first hand:

Evaluative judgments concerning juror suitability are often made partially in response to nuance, demeanor, body language, and a host of kindred considerations. Thus, the trial judge, who sees and hears both the prospective juror and the opposing attorneys in action, is in the best position to pass judgment on counsel's motives.

*Bergodere,* 40 F.3d at 517.

The Supreme Court has not detailed what may constitute a prima facie showing under *Batson.* Instead, in *Batson* itself, the Court said:

For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning a prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. The Supreme Court has directed trial judges to consider "all relevant circumstances" in determining whether a prima facie case of racial discrimination has been established. *Id.* at 96–97, 106 S.Ct. at 1723. The Supreme Court has thus largely left the question of what constitutes a prima facie case to the wisdom of trial judges themselves. Here, the trial judge, in light of all the circumstances, did not require the prosecution to state a rationale for these strikes, as would have been done if the judge had found a prima facie case of discrimination.

In *Bergodere,* this court noted, in rejecting a *Batson* claim based on the peremptory challenge of the only black venireperson, that "[a] defendant who advances a *Batson* argument ordinarily should 'come forward with facts, not just numbers alone.'" *Id.* at 516 (citing *United States v. Moore,* 895 F.2d 484, 485 (8th Cir.1990) and *United States v. Dawn,* 897 F.2d 1444, 1448 (8th Cir.1990)).

The Seventh Circuit has similarly expressed reservations about the use of numbers alone. *McCain v. Gramley*, 96 F.3d 288, 292 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1320, 137 L.Ed.2d 482 (1997); *see also United States v. Ferguson*, 23 F.3d 135, 141 (6th Cir.1994).

We need not determine whether statistical disparity alone can demonstrate a prima facie case, a position adopted by many courts. *See, e.g., Turner v. Marshall*, 63 F.3d 807, 812–13 (9th Cir.1995); *United States v. Alvarado*, 923 F.2d 253, 255–56 (2d Cir.1991); *see also* 2 LaFave & Israel, *Criminal Procedure* § 21.3, at 257 n. 135.7 (Supp.1991) (citing cases). This case in the trial court might have been regarded as fairly close, and the facts [20] are such that we might have upheld the trial judge if she had found a prima facie case. It is enough to say that the numbers here, particularly in the absence of circumstances suggesting juror bias, judge insensitivity, or improper motive by the state prosecutor, were not so blatant as to *compel* the judge to make such a finding.

■ It is the defendant who carries the burden of persuasion regarding the existence of a prima facie case. *See Bergodere*, 40 F.3d at 515. Part of that burden includes the duty to show circumstances sufficient, when combined with the demonstration that the prosecution's challenge was directed at a member of a cognizable racial group and the demonstration that the challenge was peremptory, to raise an inference that the prosecutor struck the venireperson on account of race. *See Batson*, 476 U.S. at 96, 106 S.Ct. at 1723; *Bergodere*, 40 F.3d at 515–16. The trial judge here was not persuaded that such an inference of discrimination was raised, and having found no clear error in the trial judge's decision, neither are we.

*Fundamental Miscarriage of Justice*

■ We note that Brewer does suggest that he is actually innocent of this crime. Although this is not a capital case where further review may be required, *Sawyer v. Whitley*, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), we explain why we think this case works no fundamental miscarriage of justice. Under *Batson*, if the petitioner had established a prima facie case of discrimination, the prosecution would have then been required to articulate nondiscriminatory reasons for its challenges. *Purkett v. Elem*, 514 U.S. 765, 766–68, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995). Here, the prosecution was not required to provide such an explanation at the time and was unable to recall its reasons when the habeas petition was brought seven years later.

There is some reason to think there was no infection of the process at all. The trial judge was herself quite sensitive to issues of bias—it was she, and not counsel, who initially suggested voir dire as to bias, and she returned to the point several times. The venire members were, in the end, asked whether they were prejudiced against African Americans or Hispanics and one was dismissed for bias. Such a voir dire creates a "high probability that the individual jurors seated in a particular case were free from bias." *Allen v. Hardy*, 478 U.S. 255, 259, 106 S.Ct. 2878, 2881, 92 L.Ed.2d 199 (1986) (per curiam). Accordingly, we do not think that the factfinding process was tainted, causing a miscarriage of justice here. *Id.*

Of course, the core *Batson* principle is that "states do not discriminate against citizens who are summoned to sit in judgment against a member of their own race." *Allen*, 478 U.S. at 259, 106 S.Ct. at 2880. This principle "strengthens public confidence in the administration of justice." *Id.* As to the first four jurors, we have no evidence that the Commonwealth was discriminating against black venire members. But as to the fifth juror, the prosecution did have a valid nondiscriminatory reason for the challenge.

*The Brady Claim*

■ As to the claim that the boyfriend's identity should have been earlier disclosed, we agree with the district court that there

---

**20.** Here, the numbers at first blush may give one pause, since, at the time of Brewer's initial objection, the prosecution had used four of its nine challenges against blacks, thus excluding four of the six blacks seated in the jury box (assuming the race of the jurors as Brewer claimed, a fact not established). However, the state trial judge had observed the process and apparently saw nothing serious enough to demand reasoning from the prosecution.

was no *Brady* violation. The trial court correctly applied federal law, and her factual determinations were certainly not clearly erroneous. *See* 28 U.S.C. § 2254(d) (pre-AEDPA version).

■ Brewer did not ask for the boyfriend's identity until the first day of trial, and when he did obtain it, he did not ask for a continuance to make full use of the information. Most important, as the district court so aptly observed, "there is no evidence the government knew that the boyfriend's identity was potentially exculpatory prior to trial. . . . The government believed the boyfriend was the semen donor and that this evidence, in itself, was incriminatory rather than exculpatory." The rule in *Brady* does not typically apply unless the prosecutor has knowledge of the exculpatory evidence. *See, e.g., United States v. Moore,* 25 F.3d 563, 569 (7th Cir.1994).

That Brewer later produced evidence that the boyfriend was not the source of the semen does not put "the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995).[21] Given all the evidence, Brewer has not met his burden.

The grant of the writ of habeas corpus is *reversed* and the writ is *vacated.*

---

21. As the district court noted, the victim testified Brewer penetrated her twice, once with a condom and once without, but there was no evidence he ejaculated.