**George OVERTON, Petitioner,**

v.

**James NEWTON, Superintendent, Watertown Correctional Facility, Respondent.**

**No. 98–CV–5507 (FB).**

United States District Court, E.D. New York.

June 11, 2001.

---

Ian Rosenberg, Cahill Gordon & Reindel, New York City, for petitioner.

Eliot Spitzer, Attorney General of the State of New York, by Robin A. Forshaw, Dian Kerr McCullough, New York City, for respondent.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

In this *habeas* proceeding pursuant to 28 U.S.C. § 2254, petitioner George Overton ("Overton") has established that his rights under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), have been violated.[1]

## BACKGROUND

■ Overton, who is black, was convicted by a jury in Queens County Supreme Court on February 1, 1995 for Criminal Sale of a Controlled Substance in the Third Degree (N.Y.Penal Law § 220.39[1] ), Criminal Possession of a Controlled Substance in the Third Degree (N.Y.Penal Law § 220.16[1] ), and Criminal Possession of a Controlled Substance in the Seventh Degree (N.Y.Penal Law § 220.03). He was sentenced to a six to twelve-year term of imprisonment and is presently on parole, which is scheduled to expire in 2010.[2] In addition to his *Batson* challenge, Overton's *habeas* petition also asserts a Confrontation Clause violation on the ground that the trial judge impermissibly circumscribed his counsel's cross-examination of certain witnesses.

In respect to *Batson*, the issue was raised by Overton's trial counsel at the conclusion of the second round of challenges after the prosecutor exercised five of six peremptory challenges to exclude every qualified black in the jury box in that round.[3]

Jury selection commenced on January 19, 1995, following routine pre-screening of potential jurors the previous day. The court employed the jury box system, requiring peremptory challenges to be exercised in rounds. Three rounds were completed on that date. Sixteen prospective jurors had been called from the venire for the first round.[4] Following the first round, two were struck for cause; the prosecutor exercised four peremptory challenges; defendants used five.[5] *See* Tr.

1. Overton brought his petition *pro se.* The Court expresses its gratitude to the law firm of Cahill Gordon & Reindel for allowing Ian Rosenberg, Esq., an associate with the firm, to accept the Court's assignment as *pro bono* counsel.

2. A paroled state prisoner is "in custody" within the meaning of the federal *habeas corpus* statute. *See Jones v. Cunningham,* 371 U.S. 236, 243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

3. Overton was tried with a co-defendant, Sonya Pegram, a black female. Pegram's counsel joined in the *Batson* challenge. *See* Trial Transcript ("Tr.") at 223. Pegram was convicted, but did not raise a *Batson* claim in her direct appeal. *See People v. Pegram,* 233 A.D.2d 468, 650 N.Y.S.2d 591 (2d Dep't 1996), *leave to appeal denied,* 89 N.Y.2d 988, 656 N.Y.S.2d 746, 678 N.E.2d 1362 (1997). The Court has no knowledge as to whether Pegram thereafter made any effort to revive her *Batson* claim on either the state or federal level.

4. "Venire," as used throughout this decision, refers to the total number of potential jurors present in the courtroom after those individuals claiming that jury service would impose a hardship or believed that they held a bias had been excused.

5. The prosecutor was entitled to fifteen peremptory challenges; defendants, collectively,

at 163–66. Five jurors were seated. No contemporaneous record was made of the races of either the challenged jurors or those seated.

Sixteen prospective jurors were also selected from the venire for the second round. Three were dismissed for cause; the prosecutor exercised six peremptory challenges; defendants used four. *See* Tr. at 218–21. At the end of the round, three more jurors were seated. Once again, no contemporaneous record was made of the races of any of the potential jurors. The *Batson* issue was then raised by Overton's counsel, claiming that by her "rough count" the prosecutor had used seven of nine peremptory challenges against blacks.[6] Tr. at 223. She concluded, "that shows [a] clear *prima facie* showing, and . . . it is [the court's] burden to make sure that challenges were properly exercised." *Id.* The prosecutor responded that the claim was frivolous because he had used one of his challenges during the second round to strike a white person and, in any event, three of the eight selected jurors were black. *See* Tr. at 224–25. The prosecutor also alleged that the defendants had only challenged whites, and made a cross-application on that basis. *See* Tr. at 224. The trial judge summarily rejected each party's contention, commenting only that neither side had "made out a *prim[a] facie* case of purpose[ful] discrimination." Tr. at 225. The trial court then immediately commenced the third round of jury selection. Only four prospective jurors were placed in the jury box for the third round,

since that was all that was left from the original venire. *See* Tr. at 227. Two jurors were chosen in that round; no record was made of the races of any of the four.

Following the third round, before concluding proceedings for the day, the trial judge identified the races of the thirty-two members of the first two panels, and whether each had been seated, excused for cause or stricken by peremptory challenge. *See* Tr. at 252–55. She noted that she had postponed making a record "so that we could let the prospective jurors get on their way." Tr. at 252.

When quantified and deciphered by the Court, the trial judge's findings add up as follows: In the first round, the prosecutor used his four challenges to strike two of five blacks. Therefore, of the five jurors seated in the first round, three were black. In the second round, six blacks were put in the box; one was struck for cause. The prosecutor then used five of his six challenges to strike all of the remaining black potential jurors. In sum, the prosecutor used his ten peremptory challenges to strike seventy percent (7 out of 10) of the qualified blacks in the first two rounds, including all five qualified blacks in the second round.[7]

On January 23, 1995, a fourth round ensued before the jury was completed. The last two jurors, in addition to two alternates, were selected from a panel of sixteen prospective jurors drawn from a fresh venire. There is no record of the racial composition of the two jurors or the

---

were entitled to the same number. *See* N.Y.Crim.Proc.Law § 270.25[2][b], [3]; Tr. at 59.

**6.** This "rough count" was incorrect; the prosecutor had used ten challenges.

**7.** In making her record, the trial judge found that venireman Phillipe Gerdes ("Gerdes") had been struck by the prosecutor in the

second round. *See* Tr. at 254. The trial judge's record thus suggests that the prosecutor had exercised a total of eleven peremptory challenges—seven in the second round. However, the contemporaneous record clearly indicates that petitioner's counsel dismissed Gerdes. *See* Tr. at 219. Therefore, the prosecutor actually exercised only a total of ten challenges during the first two rounds—six in the second round.

alternates; nor is there any record of the size of the second venire. The racial composition of the twenty jurors called from the venire for the third and fourth rounds also is unknown, other than that one of the jurors dismissed for cause was Asian and that the defendants struck one white juror and one black juror. *See* Tr. at 347–49.

Although there is no record of the size of the second venire or its racial composition, the size of the first venire during the first two rounds was thirty-six, since sixteen potential jurors were selected for each round and only four remained for the third round. In respect to the racial composition of the first venire, since the trial judge identified the races of the thirty-two potential jurors in the first two rounds, only the races of the four third-round panelists are unknown. Of the thirty-two, thirty-four percent were black (11 out of 32); of the twenty-eight who remained after the four dismissals for cause, thirty-six percent were black (10 out of 28).

The two *habeas* issues raised by petitioner were fully exhausted on direct appeal. Affirming the conviction, the Appellate Division, Second Department, rejected the *Batson* challenge, stating, without elaboration, that Overton's reliance "solely upon the number of peremptory challenges made by the prosecutor against black venirepersons" failed to establish a *prima facie* case. *People v. Overton,* 238 A.D.2d 528, 657 N.Y.S.2d 192, 193 (2d Dep't 1997). The appellate court further held that the trial court had properly used its discretion in limiting cross-examination. *Id.* Leave to appeal to the Court of Appeals was denied. *See People v. Overton,* 90 N.Y.2d 908, 663 N.Y.S.2d 520, 686 N.E.2d 232 (1997).

## DISCUSSION

### I. Standard of Review, 28 U.S.C. § 2254

Because Overton's petition postdates the enactment of the Antiterrorism and Effec-

tive Death Penalty Act of 1996 ("AEDPA"), AEDPA's revisions of 28 U.S.C. § 2254 govern this proceeding. *See Williams v. Taylor,* 529 U.S. 362, 402, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[b]ecause [petitioner] filed his petition [after the effective date of AEDPA's revisions to § 2254], [his] case is governed by the statute as amended by AEDPA"); *see also Lurie v. Wittner,* 228 F.3d 113, 120–21 (2d Cir.2000) (same). Pursuant to § 2254, as amended by AEDPA, *habeas* relief may not be granted unless the state court decision: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Williams,* 529 U.S. at 402–11, 120 S.Ct. 1495.

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495. A state court decision involves an "unreasonable application" of Supreme Court precedent if it unreasonably applies a governing legal rule to the particular facts of a case. *See id.* at 409, 120 S.Ct. 1495. This requires a *habeas* court to "ask whether the state court's application of clearly established federal law was objectively unreasonable," not whether the application was erroneous or incorrect. *Id.; see also Clark v. Stinson,* 214 F.3d 315,

320–21 (2d Cir.2000). In that respect, the standard to be applied "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." *Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000) (internal citation and quotation marks omitted). The Second Circuit has cautioned that while "[s]ome increment of incorrectness beyond error is required … the increment need not be great; otherwise, *habeas* relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (internal citations and quotation marks omitted).

■ A state court determination of a factual issue is presumed to be correct. 28 U.S.C. § 2254(e)(1). The determination is unreasonable only where the petitioner meets his or her burden of "rebutting the presumption of correctness by clear and convincing evidence." *Id.; see also Francis S. v. Stone,* 221 F.3d 100, 114 (2d Cir.2000).

## II. The *Batson* Challenge

■ "In assessing a challenge under *Batson,* a trial court must (1) decide whether the defendant has made a *prima facie* showing that the prosecutor has exercised a peremptory strike on the basis of race; (2) if so, decide whether the prosecutor has satisfied the burden of coming forward with a race neutral explanation for striking the potential juror; and, if so, then must (3) make a determination whether the defendant has carried his burden of proving purposeful discrimination." *Jordan v. Lefevre,* 206 F.3d 196, 200 (2d Cir.2000), citing *Batson,* 476 U.S. at 96–98,

106 S.Ct. 1712. Since the trial court did not require the prosecutor to proffer his reasons for excluding any of the blacks, the issue in the present case is whether the trial court was correct in summarily ruling that there was no *prima facie* showing of prosecutorial race-based peremptory strikes.

"The Supreme Court has not detailed what may constitute a *prima facie* showing under *Batson.*" *Brewer v. Marshall,* 119 F.3d 993, 1004 (1st Cir.1997). *Batson* simply instructed that once a peremptory challenge has been exercised against a member of the defendant's race, the trial court should consider this, together with "any other relevant circumstances," to determine whether an inference of discrimination has been manifested.[8] 476 U.S. at 96, 106 S.Ct. 1712. As illustrative of "relevant circumstances," the Court in *Batson* noted that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination," as well as "the prosecutor's questions and statements during *voir dire* examination." 476 U.S. at 97, 106 S.Ct. 1712. In eschewing a more particularized view, the Court simply expressed "confidence that trial judges, experienced in supervising *voir dire,* will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a *prima facie* case of discrimination," *id.,* and chose not to "attempt to instruct" trial courts "how best to implement" its holding. *Batson,* 476 U.S. at 99 n. 24, 106 S.Ct. 1712.

---

**8.** Subsequent to *Batson,* a criminal prosecution, the Supreme Court has held that the *Batson* principle applies in both civil and criminal trials, *see Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 630–31, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), "whether or not the [challenging party] and the exclud-

ed jurors share the same races," *see Powers v. Ohio,* 499 U.S. 400, 402, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), and regardless of which party raises the challenge. *See Georgia v. McCollum,* 505 U.S. 42, 56, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

It is clear, therefore, that although not a single juror can be excluded based on race, a single strike in isolation cannot suffice to raise the requisite inference. *See United States v. Stavroulakis,* 952 F.2d 686, 696 (2d Cir.1992) ("[r]eference merely to the race of one excused venireman, without more, is insufficient to raise an inference of discrimination"); *see also Anderson v. Cowan,* 227 F.3d 893, 901 (7th Cir.2000) (two strikes not sufficient where state trial judge was "unable to discern the race of the jury or of the other excluded venire members").

What is less clear is when, if ever, statistics may suffice to satisfy the *prima facie* burden. In *Brewer,* where the First Circuit upheld a state court's rejection of a *Batson* challenge under a pre-AEDPA *de novo* standard of review, it noted that although under the facts of that case it was not necessary to determine "whether statistical disparity alone can demonstrate a *prima facie* case," many courts had adopted that position. 119 F.3d at 1005. As examples, it pointed to the Ninth Circuit's decision in *Turner v. Marshall,* 63 F.3d 807 (9th Cir.1995), and the Second Circuit's decision in *United States v. Alvarado,* 923 F.2d 253 (2d Cir.1991).

Respondent acknowledged during oral argument that as a consequence of *Alvarado* "the Second Circuit has, certainly, relied on statistics alone." Tr. of Oral Argument, Dec. 19, 2000, at 15. Indeed, *Alvarado* set the stage for Second Circuit precedent for assessing when statistical information, without more, can satisfy the *prima facie* inference of discrimination. There, after acknowledging that it would be impermissible to reject a *Batson* challenge on the basis of the ultimate composition of the jury, the court turned its attention to whether the facts were sufficient to satisfy *Batson's prima facie* prong. As in the present case, "[t]he jury was chosen using the 'jury box' system, with peremptory challenges exercised in 'rounds.'" *Alvarado,* 923 F.2d at 255. The suspect minority at issue in *Alvarado* was viewed as both blacks and Hispanics since the defendant was half black and half Puerto Rican. The twelve jurors were selected over five rounds; three alternates were selected in the sixth round. In total, the prosecutor exercised only seven challenges; however, four were against minorities, "with three out of six used to challenge minority members in selection of the twelve regular members of the jury." *Id.* In the fifth round, "the prosecution waived its challenge at a time when three minority members were seated in the jury box, available for challenge." *Id.* As in the present case, there was no indication that the questioning during *voir dire* suggested any evidence of discriminatory intent. Moreover, the racial composition of the balance of the venire was unknown.

In assessing these factual dynamics, the court viewed *Batson* as "indicat[ing] that statistical disparities are to be examined." *Id.* It reasoned as follows:

> Here, the prosecution's challenge rate against minorities was 50 percent (three of six) in the selection of the jury of 12, and 57 percent (four of seven) in the selection of the jury of 12 plus alternates. Whether this rate creates a statistical disparity would require knowing the minority percentage of the venire; for example, if the minority percentage of the venire was 50, it could be expected that a prosecutor, acting without discriminatory intent, would use 50 percent of his challenges against minorities. Only a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination.

*Id.*

Since the racial composition of the venire was not known, the court accepted "as a

surrogate for that figure the minority percentage of the population of the Eastern District, from which the venire was drawn." *Id.* at 256. The court cited to an earlier decision in the case (*"Alvarado I "*) where it took judicial notice of census data reporting the minority population to be twenty-nine percent. *See id.* (citing *Alvarado I,* 891 F.2d 439, 444 & n. 5 (2d Cir.1989)). It concluded that "a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under *Batson.*" *Alvarado,* 923 F.2d at 256. Regarding the prosecutor's waiver in the fifth round, the court acknowledged that the failure to exercise an available challenge against minority venirepersons "has been mentioned in the decisions of some courts finding no *prima facie* case of discrimination;" nonetheless, it concluded that "[a] prosecutor may not avoid the *Batson* obligation to provide race-neutral explanations for what appears to be a statistically significant pattern of racial peremptory challenges simply by forgoing the opportunity to use all of his challenges against minorities." *Id.*

In factual contrast to *Alvarado,* the Second Circuit in *United States v. Diaz,* 176 F.3d 52 (2d Cir.1999), employing *Alvarado 's* standard of "significantly higher" minority challenges to the minority percentage of the venire, determined that no significantly higher percentage was demonstrated where "the government's 25 percent rate of minority strikes was not significantly higher than the 23 percent minority population of the venire," and "the 44 percent majority composition of the 16 member jury ... exceeded the 16 percent minority population in the relevant area in Connecticut from which the jury was selected." *Id.* at 77.

The Second Circuit has not always evaluated statistical data by measuring the proportionality of challenges against the actual or surrogate venire, and has exhibited a rather minimalist view of when statistics can satisfy a pattern of discrimination. For example, in *Tankleff v. Senkowski,* 135 F.3d 235 (2d Cir.1998), in determining that a *prima facie* case had been made out under *Powers,* the circuit court, acknowledging that "we have little to go on besides the statistics," *id.* at 249, and that under *Powers* "it might be more difficult to make out a [*prima facie* ] case of discrimination in situations involving a defendant and venireperson of different races," *id.* at 248, concluded, "the fact that the government tried to strike the only three blacks who were on the panel constitutes a sufficiently dramatic pattern of actions to make out a *prima facie* case." *Id.* at 249.

The cases cited in *Tankleff* in support of this conclusion further illuminate the Second Circuit's view of the circumstances when statistical data would rise to the level of a *prima facie* inference of discrimination. In addition to citing *Alvarado,* the court relied on the Seventh Circuit's decision in *McCain v. Gramley,* 96 F.3d 288, 292 (7th Cir.1996), *cert. denied,* 520 U.S. 1147, 117 S.Ct. 1320, 137 L.Ed.2d 482 (1997), for the proposition that the inference of discrimination may arise "where there are only a few members of a racial group on the venire panel and one party strikes each one of them;" the Ninth Circuit's decision in *United States v. Chinchilla,* 874 F.2d 695, 698 & n. 4 (9th Cir.1989), where the striking of the only two minority jurors was deemed sufficient; the Ninth Circuit's decision in *Turner,* 63 F.3d at 813, where five of nine minority jurors were struck, and the Eighth Circuit's decision in *United States v. Battle,* 836 F.2d 1084, 1086 (8th Cir.1987), where five of seven were struck. *See Tankleff,* 135 F.3d at 249. Subsequent to *Tankleff,* the Second Circuit has held that the striking of three black members of a seven-person panel required the trial judge to allow

defense counsel to present argument in support of his *Batson* challenge and to develop a full record before the court made its *prima facie* ruling. *See Jordan,* 206 F.3d at 200–01.

Apropos the present case, the Second Circuit's reliance on *Turner* in *Tankleff* is particularly instructive. In *Turner,* citing to *Alvarado* for the proposition that "[a]s part of its consideration of whether an inference of discrimination has been raised, several courts have analyzed whether the percentage of prosecutorial challenges made against minorities was disproportionately higher than the percentage of the minority group within the venire," 63 F.3d at 813, the Ninth Circuit reasoned, in support of its finding that the striking of five of nine blacks was impermissible, as follows:

> Although the record lacks statistics on the racial makeup of the venire as a whole, approximately 30 percent (11 out of 37) of the venirepersons who appeared before the court for voir dire were African–American. Yet the government used a significantly higher percentage of its peremptory challenges—56 percent—against African–Americans. Such a disparity also supports an inference of discrimination. [Citing *Alvarado.*] *Thus, two different statistics—the percentage of available African—Americans challenged, and the percentage of peremptory challenges used against African–Americans—provide support for an inference of discrimination* .

*Id.* (emphasis added).

In the present case, at the time the *Batson* issue was raised the prosecutor had exercised seventy percent of his challenges against blacks (7 out of 10). This was statistically more than twice the thirty-four percent of blacks comprising the thirty-two venirepersons whose races were known (11 out of 32). If it be assumed that each of the other four venirepersons was black, the percentage would be forty-seven percent, still a significant statistical difference; however, if it be assumed that none of the four were black, the percentage would be thirty percent. As in *Alvarado* and *Turner,* there are multiple sets of statistics that form a pattern to support a *prima facie* showing of discrimination.

■ In any event, a finding in the present case of a *prima facie* showing of discrimination squares with the Second Circuit's statistical precedents, and is indeed more compelling. The Court notes, however, that the Second Circuit has yet to analyze a *prima facie Batson* challenge under AEDPA. *Alvarado* was a direct appeal; *Tankleff* was a pre-AEDPA *habeas; Jordan* failed to reference the AEDPA *habeas* standard and, in any event, focused on the violation of the third *Batson* step.

Some circuit courts have held in applying AEDPA that the *prima facie* first step inquiry involves a determination of fact. *See Weaver v. Bowersox,* 241 F.3d 1024, 1030 (8th Cir.2001) ("[w]e have held that each of the three steps of the *Batson* inquiry involves a determination of fact"); *Soria v. Johnson,* 207 F.3d 232, 238 (5th Cir.2000) ("[t]he state court's determination that Soria failed to make a *prima facie* showing is a factual finding"). Thus, § 2254(d)(2) of AEDPA is applicable, requiring the petitioner to overcome the presumption of correctness accorded factual findings under § 2254(e)(1) "with clear and convincing evidence." *See Weaver,* 241 F.3d at 1030; *Soria,* 207 F.3d at 238. This is the same standard applicable to factual determinations prior to AEDPA. *Compare* 28 U.S.C. § 2254(d) (1994) (absent enumerated circumstances, a state court determination of a factual issue "shall be presumed to be correct;" "the burden shall rest upon the applicant to establish by convincing evidence that the factual deter-

mination by the State court was erroneous") *with* 28 U.S.C. § 2254(e)(1) (1994 & Supp.2000) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption by clear and convincing evidence."); *see also Bryson v. Ward,* 187 F.3d 1193, 1207 n. 11 (10th Cir.1999) ("a federal *habeas* court is required to afford a presumption of correctness to a state court's factual determinations under both pre and post-AEDPA law").

■ Other circuit courts, both pre and post-AEDPA, have considered the issue to present a mixed question of law and fact. *See, e.g.,* post-AEDPA—*Mahaffey v. Page,* 162 F.3d 481, 484 (7th Cir.1998) ("the preliminary question of whether a *prima facie* case has been shown presents a mixed question of law and fact"), *cert. denied,* 526 U.S. 1127, 119 S.Ct. 1786, 143 L.Ed.2d 814 (1999); *Tolbert v. Page,* 182 F.3d 677, 681 n. 6 (9th Cir.1999) ("[t]he *prima facie* [*Batson* ] inquiry involves a mixed question of law and fact, because the court must determine whether the facts are sufficient to meet the requirements of the legal rule and, therefore, to proceed to the ensuing steps of the *Batson* analysis"); pre-AEDPA—*United States v. Bergodere,* 40 F.3d 512, 516 (1st Cir.1994) ("[a] careful reading of *Batson* convinces us that ... this determination can be characterized as a mixed question of law and fact"). Prior to AEDPA, federal *habeas* review of mixed questions of law and fact was *"de novo."*

*Washington v. Schriver,* 240 F.3d at 101, 110 (2d Cir.2001). This is the same standard of review applicable on direct appeal. *See United States v. Kliti,* 156 F.3d 150, 152–53 (2d Cir.1998) (mixed questions of law and fact require *de novo* review on direct appeal). In the context of federal *habeas* review, a mixed question of law and fact translates to a "mixed constitutional question (*i.e.,* application of constitutional law to fact)," *Williams,* 529 U.S. at 400, 120 S.Ct. 1495 (O'Connor, J. concurring), and, under AEDPA, invokes the standard set forth in § 2254(d)(1), requiring the *habeas* court to determine whether the state court's decision "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." [9] 28 U.S.C. § 2254(d)(1).

In *Alvarado I,* the Second Circuit opined that "the threshold decision concerning the existence of a *prima facie* case of discriminatory use of peremptory challenges involves both issues of fact and an issue of law," meaning that once the fact-finding has been done, "the judge must then determine, as a matter of law, whether these underlying facts suffice to establish a *prima facie* case." 891 F.2d at 443. This appears to place the Second Circuit in the camp of those courts that recognize that the *Batson prima facie* issue is one of mixed law and fact, rather than a purely factual determination. Under AEDPA, therefore, the Court must determine whether, given the state of the developed facts at the time of the *Batson* challenge,

---

9. The shift from *de novo* review to review under the "unreasonable application" standard can make a critical difference on post-AEDPA *habeas* review because "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams,* 529 U.S at 365, 120 S.Ct. 1495 (emphasis in original). Therefore, unlike cases where *de novo* review is required, the Court is *"not* permitted to substitute [its] independent judgment as to the correct outcome.... Rather a federal *habeas* court operating pursuant to § 2254(d)(1) must only ask if the state-court decision was reasonable." *Washington v. Smith,* 219 F.3d 620, 628 (7th Cir.2000) (emphasis in original). In other words, the state-court decision must be "both incorrect *and* unreasonable" before the writ may be granted. *Id.* (emphasis in original).

the trial court's determination that there was no *prima facie* showing violated the "unreasonable application" prong of § 2254(d)(1).

Respondent argues that since the Supreme Court has never specifically held that statistics, without more, can satisfy a defendant's *prima facie Batson* burden, the federal law was not clearly established at the time of the state court's decision; consequently, reliance on statistics alone would result in an unreasonable application of existing Supreme Court precedent. It is true that the Supreme Court in *Batson* chose not to establish precise standards regarding the *prima facie* burden or instruct trial courts how best to implement its holding. It does not follow, however, that this should preclude *habeas* AEDPA review of *prima facie* determinations. To hold otherwise would mean that under AEDPA a federal *habeas* court could never pass on the question of whether a *prima facie Batson* violation had been established. This would be an overly restrictive reading and application of *Batson*. It would undermine the principle that "cases involving intentional discrimination in the selection of juries and grand juries offer a compelling example" of the "need for the writ" on the federal level "as a remedy to deter state courts from violating the Constitution." *Brown v. Kuhlmann*, 142 F.3d 529, 543 (2d Cir.1998).

 It is sufficient to recognize that the clearly established governing legal rule pertaining to the *prima facie* burden announced in *Batson* is simply to be taken at face value: an inference of racial discrimination satisfies a *prima facie* case. Although inferences of racial discrimination defy standardization or quantification, as implicitly recognized by *Batson*, they are nonetheless self-evident and the subject of good common sense. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct.

2943, 57 L.Ed.2d 957 (1978) (commenting in the context of a Title VII action that inferences of racial discrimination are to be drawn in "light of common experience"); *see also* 4 Leonard B. Sand, *et al.*, Modern Federal Jury Instructions ¶ 75.01 (1998) (jurors are charged that "[i]n drawing inferences, [they] should exercise [their] common sense" and "are permitted to draw ... such reasonable inferences as would be justified in light of their experience").

In addition, the Supreme Court has provided some guidance. For example, prior to Overton's trial, the Court described the *prima facie* burden imposed under Title VII as "minimal," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and not "intended to be rigid, mechanized, or ritualistic." *Waters*, 438 U.S. at 577, 98 S.Ct. 2943. Since *Batson* is part of the "familiar framework [ ] derived from the Supreme Court's equal protection and Title VII jurisprudence," *Evans v. Smith*, 220 F.3d 306, 312 (4th Cir.2000), these are apt benchmarks. *See Batson*, 476 U.S. at 94 n. 18, 106 S.Ct. 1712 (the Supreme Court's Title VII decisions "have explained the operation of *prima facie* burden of proof rules"). *See also, e.g., Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir.2001) (ADEA plaintiff's burden is *de minimis* at the *prima facie* stage); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir.2001) ("[t]he burden upon [an ADEA or Title VII] plaintiff to prove a *prima facie* case is minimal").

And, of course, further guidance is found in *Batson*'s explicit recognition that multiple strikes could constitute a "pattern" giving rise to the inference of discrimination. *See* 476 U.S. at 97, 106 S.Ct. 1712. Such is the present case. Given that the prosecutor had five remaining challenges after the second round, striking the five

blacks in that round virtually assured the prosecutor of a majority non-black jury since he thereby kept the black composition of the jury to three with only four more jurors to be selected; moreover, that the percentage of strikes against blacks was significantly higher than the percentage of blacks in the first venire, even if it improbably be assumed that the four unknown venirepersons were black, further supports the inference of discrimination.[10]

■ The Court concludes, therefore, that the trial court's determination that the petitioner's *Batson* challenge did not rise to the level of a *prima facie* inference of discrimination was an unreasonable application of clearly established Supreme Court law to the facts.[11] The trial court should have required the prosecutor to proffer race-neutral reasons for his strikes against the black venirepersons.[12]

10. If the Court were to take judicial notice of data from the census conducted closest to the date of trial, it would find that the prosecutor's black challenges were at a rate more than three times the likely black percentage of an average venire. *See* Bureau of the Census, U.S. Department of Commerce, *1990 Census of Population and Housing, Summary Population and Housing Characteristics, New York* 78 (1991) (showing the black population of Queens County to have been 423,211 of a total population of 1,951,598, or twenty-two percent). Although, as in *Alvarado*, these statistics could be used on direct appeal in the exercise of an appellate court's *de novo* review, *see, e.g., Browning–Ferris Indus. of S. Jersey, Inc. v. Muszynski*, 899 F.2d 151, 161 (2d Cir.1990), the Court has doubts as to whether under AEDPA *habeas* review such statistics could be used. *See supra* note 9. Since in the present case sufficient facts were before the trial court notwithstanding these statistics to raise the *prima facie Batson* inference, there is no need to resolve this issue.

11. If, unlike in the present case, the record was insufficient to establish the minority percentage of the venire or other relevant statistical data, the Court would have to determine whether petitioner had been afforded an opportunity to develop the record at trial or,

## III. The Confrontation Issue

■ Overton also contends that the trial court impermissibly circumscribed his right to cross-examine the prosecutor's police witnesses. Specifically, Overton complains that the trial court curtailed cross-examination regarding the witnesses' use of slang during buy-and-bust operations, tactics used by police to convince suspected drug dealers that they are legitimate buyers, and the witnesses' concerns for the safety of undercover police officers. Although in light of the Court's determination of the *Batson* issue there is no need to reach petitioner's confrontation issue, the Court nonetheless finds it to be meritless.

■ "Restrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence may not be arbitrary or disproportionate to the pur-

having been given the opportunity, simply failed to create an adequate record. *Compare Jordan*, 206 F.3d at 201 (writ granted where trial court ruled on *Batson* challenge "in a perfunctory exercise" and "[w]ithout hearing any argument from defense counsel") *with Anderson*, 227 F.3d at 901–02 (writ denied because defendant relying on statistics to support *Batson* challenge failed to "preserve the record of the racial composition of the venire pool").

12. Notably, "a trial judge may rule on a *Batson* application even in the absence of a *prima facie* showing of discrimination." *Jordan*, 206 F.3d at 200 (citing *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). Consequently, as the First Circuit aptly noted in *Bergodere*, it might be wise for the trial judge to ask the prosecutor to proffer reasons for the basis of the strikes "if only to confirm the judge's intuition and flesh out the record on appeal." 40 F.3d at 517; *cf. United States v. Clemmons*, 892 F.2d 1153, 1156 (3d Cir.1989) ("district courts should expressly address the *prima facie* issue before requiring an explanation from the prosecutor").

poses they are designed to serve." *Michigan v. Lucas*, 500 U.S. 145, 151, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) (internal quotation marks and citation omitted). With respect to the scope of cross-examination, "trial judges retain wide latitude" to reasonably limit a criminal defendant's right to cross-examine a witness "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The Court has reviewed the trial record and, given the deference accorded the trial court, it does not support a determination that the court's actions were contrary to or an unreasonable application of established Supreme Court precedent.

### CONCLUSION

Petitioner's writ of *habeas corpus* is granted. The indictment shall be dismissed unless a new trial is commenced within sixty days of the date of entry of this order.[13]

**SO ORDERED.**

---

13. While the respondent would ordinarily have the right to a reconstruction hearing, *see Tankleff*, 135 F.3d at 251, counsel for respondent has candidly advised the Court that no purpose would be served by a hearing be- cause neither the prosecutor nor his *voir dire* notes can be located. *See* Letter from Robin A. Forshaw, Esq. to the Court, dated May 25, 2001.