Rashon **HARRISON**, Petitioner,

v.

Thomas **RICKS**, Superintendent, Upstate Correctional Facility, and Eliot Spitzer, New York State Attorney General, Respondents.

No. CV 01 0534.

United States District Court, E.D. New York.

July 21, 2004.

Svetlana M. Kornfeind, Esq., The Legal Aid Society, Criminal Appeals Bureau, NY, for Petitioner.

Richard A. Brown, District Attorney, Queens County by John M. Castellano, Alyson J. Gill, and Donna Aldea, Assistant, District Attorneys, Kew Gardens, NY, for Respondents.

## MEMORANDUM & ORDER

DEARIE, District Judge.

Petitioner Rashon Harrison seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, petitioner's application is denied, and the petition is dismissed.

### Background

#### I. Procedural History

Following a jury trial, on April 3, 1997, petitioner was convicted of Criminal Sale of a Controlled Substance in the Third Degree in violation of N.Y. Penal Law § 220.39 and sentenced to an indeterminate prison term of eight to sixteen years. During the course of jury selection, petitioner's trial counsel raised and twice renewed a claim under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), objecting to the prosecutor's use of peremptory challenges to strike prospective African–American jurors. Petitioner's claims were rejected by the trial court. On appeal, petitioner argued that the trial court erred in failing to find that he had made the requisite prima facie showing that the circumstances surrounding the prosecutor's use of peremptory challenges raised an inference of discrimination. The Appellate Division affirmed, stating:

> In support of the *Batson* application, the [petitioner] noted only that the prosecutor used four of five peremptory challenges against black potential jurors and that each of those persons indicated they could be fair. In the absence of a record demonstrating other facts or circumstances supporting a prima facie case, the Supreme Court correctly found that [petitioner] failed to establish a pattern of purposeful exclusion sufficient to raise an inference of racial discrimination.

*People v. Harrison,* 272 A.D.2d 554, 708 N.Y.S.2d 433 (2 Dep't 2000). Leave to appeal to the New York Court of Appeals was denied. *People v. Harrison,* 95 N.Y.2d 866, 715 N.Y.S.2d 220, 738 N.E.2d 368 (2000).

#### II. Jury Selection

Jury selection was accomplished in three rounds. Each party was allowed a total of 15 peremptory challenges for the regular jurors. New York CPL § 270.25. In the first round, four of sixteen potential jurors were excused for cause. Of the remaining 12 potential jurors, four were identified as African–American, four were identified as Caucasian, one was identified as Asian–Indian, and one was identified as Hispanic. The racial or ethnic backgrounds of two were not identified. The prosecutor exercised three peremptory challenges, two of which were used to strike African–Americans and one of which was used to strike a juror of unidentified race or ethnicity. Five jurors were selected from the panel, including two African–Americans.

In the second round, 16 people were again seated in the jury box. Two were excused for cause. Of the remaining potential jurors, four were African–American. Six were identified as Caucasian, and the racial or ethnic backgrounds of four were not established. The prosecutor exercised three peremptory challenges against African–Americans and two against jurors whose race or ethnicity was not established. Six jurors were seated, including one African–American.

In the third round, ten prospective jurors were seated in the jury box. The twelfth juror and two alternates were selected from this panel. The prosecutor exercised three peremptory challenges, and defense counsel exercised one. (Tr. 320–23). The record does not reflect information about the racial or ethnic backgrounds of these jurors.

## III. The *Batson* Challenges

During round two of jury selection, after the prosecutor exercised two peremptory challenges against African–Americans, defense counsel objected, contending that the prosecutor was exercising peremptory challenges in a racially discriminatory manner in violation of *Batson v. Kentucky*. The trial court adjourned for the day, indicating that it would hear further argument on the *Batson* challenge. (Tr. A61). The following day, defense counsel incorporated into her challenge the two peremptory strikes made by the prosecutor in round one against African–Americans and argued that each of the four prospective jurors indicated that he or she could be fair. Defense counsel concluded her argument, stating: "ultimately what I see is a pattern that is going on here out of the ... five peremptories used by the People, four of them have thus far been [p]eople of [c]olor, Black, same color as my client. And I believe that is the only reason that they

are being bumped." (Tr. A65–66). The trial court characterized defense counsel's argument as one being made "by one who lives in the glass house and throws stones," noting that defense counsel had challenged the only potential juror of Asian–Indian descent and that she had otherwise used all her challenges to exclude Caucasian individuals. (Tr. A66–68). In the trial court's view, defense counsel's argument was essentially nothing more than that "any time, any time a Black person is p[er]empted by a prosecutor that gives rise to a claim of discrimination; the use of p[er]emptory challenges to deprive the defendant of a fair trial." (Tr. A66–67) The court concluded that counsel failed to make a prima facie showing. (Tr. A68). The trial judge noted for the record that two African–American jurors were seated in round one. In addition, with respect to the two African–American jurors struck by the prosecution in round one, the judge noted that one had a son who was allegedly falsely accused of gun possession and that the other exhibited "certain reservations about following the law." (Tr. A68).

Round two of jury selection continued, and an African–American woman was seated as a juror. Another African–American was struck by peremptory challenge by the prosecutor. Defense counsel stated, "I renew my *Batson* challenge; and I stand on the record." (Tr. A75). At that point, the prosecutor had exercised a total of eight peremptory challenges, five against African–Americans. (Tr. A73–75). The trial court again found that defense counsel failed to make out a prima facie case. *Id.* Thereafter, defense counsel exercised a peremptory challenge to exclude a Caucasian male. The prosecutor made a reverse-*Batson* claim, arguing that defense counsel had used seven of eight peremptory challenges against Caucasians, including all four potential Caucasian male jurors. (Tr. A76–77). The trial court found that

the prosecutor met its prima facie burden, and it ultimately concluded that the reasons given by defense counsel for exercising a peremptory challenge against one of the potential jurors was pretextual. That juror was seated. Following round three of jury selection, during which the twelfth juror and two alternates were selected, the jury was sworn and dismissed for the day.

On the following day, after the conclusion of jury selection, defense counsel moved for a mistrial on the ground that the court had denied her *Batson* application "without even an ounce of inquiry from the [prosecutor]." (Tr. A89). The trial court reiterated that the first step of *Batson* requires the establishment of a prima facie case. (Tr. A89). The court went on to state that defense counsel had "challenged the prosecutor ... solely on the basis that she excluded one Black person" and that "the mere exclusion of an individual of a particular recognizable ... class does not in and of itself constitute a prima facie showing of discrimination." The court continued to elaborate:

> Too often, in my opinion, attorneys equate the exclusion of a juror with racism or for discriminatory practice merely because of the fact that the individual is of a recognizable class; but everyone could be considered a member of a recognizable class, if we only look at themselves as one.

> So, for example, if the first p[er]emptory challenge[ ] used by the District Attorney is to challenge someone who is a White male, then the argument could be made that there is ... Batson conduct that is deemed definitive and offensive by the Court; and that is what I did yesterday. You said actually because they challenged [an African–American juror] that was per se Batson because she is a Black woman and, therefore, the

District Attorney must be up to discriminatory practice.

> At that stage in the proceeding you had not made out the prima facie case. This was not a scenario where the District Attorney had used fourteen p[er]emptory challenges to exclude all African–Americans on the panel. Quite to the contrary, there were already individuals on the panel that were Afr[ican]-American. And the District Attorney had used p[er]emptory challenges to strike non-minorities. So the Court finds that you had not met your first burden which is establishing a prima facie case; otherwise it makes a mockery of p[er]emptory challenges. The District Attorney would have to explain every one of their challenges. The defense would have to explain every one of their challenges while they are made.

(Tr. A89–91). In response, defense counsel reiterated her argument:

> Well, I think the record speaks for itself, but I believe my application to the Batson challenge was made after the Assistant p[er]empted two of the Black female jurors in the first—in the first panel out of the five p[er]empts she had used four of them were—four were p[er]empting people of Black descent. And I believe that my argument was that there was a pattern here, and based on that, I do believe that it made a prima facie case. The record speaks for itself.

(Tr. A91).

## Discussion

 Pursuant to 28 U.S.C. § 2254(d), a writ of habeas corpus:

shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). A state court decision is contrary to federal law, as determined by the Supreme Court, if the state court applies a rule that contradicts governing Supreme Court precedent or the state court confronts a set of facts that are materially indistinguishable from a Supreme Court decision and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405–07, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A decision is an "unreasonable application" of federal law if the state court's application of the correct governing Supreme Court precedent is objectively unreasonable. *Id.*, 529 U.S. at 409, 413, 120 S.Ct. 1495; *see also Mask v. McGinnis*, 252 F.3d 85, 88–89 (2d Cir. 2001); *Francis S. v. Stone*, 221 F.3d 100, 109–10 (2d Cir.2000); *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir.2000). However, "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410, 120 S.Ct. 1495. A decision must be both incorrect and unreasonable to be overturned. *Id.* at 411, 120 S.Ct. 1495. Nevertheless, as interpreted by the Second Circuit, "although some increment of incorrectness beyond error is required .... the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Mask*, 252 F.3d at 89 (quoting *Francis S.*, 221 F.3d at 111) (internal quotation marks omitted).

■■■ *Batson* sets forth a three-step process for trial courts to follow in determining whether a peremptory strike has

been exercised in a racially discriminatory manner. *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712. First, the court must decide whether the party challenging the use of the strike has made a prima facie showing of circumstances giving rise to an inference of discrimination. *Id.* at 97, 106 S.Ct. 1712. If a prima facie case has been established, the court must require the party exercising the strike to proffer a race-neutral reason for the strike. *Id.* Finally, the court must determine whether the party challenging the strike has carried its burden of proving that the strike was motivated by purposeful discrimination. *Id.* at 98, 106 S.Ct. 1712.

The Second Circuit case *Overton v. Newton*, 295 F.3d 270 (2d Cir.2002), makes clear that the determination of whether a prima facie case of discriminatory use of a peremptory strike has been made is a mixed question of fact and law subject to the standard set forth in 28 U.S.C. § 2254(d)(1). *Overton*, 295 F.3d at 277. Thus, in order to grant habeas relief, this Court must find that the state court determination that petitioner failed to make the requisite prima facie showing "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see id.* Because the Supreme Court has not yet confronted a set of facts that are materially indistinguishable from the facts of this case, the question before this Court is whether the determination that petitioner failed to make a prima facie showing before the state trial court "involved an unreasonable application of" the principles of *Batson. See id.*

■■■ Under *Batson*, in determining whether a prima facie showing of discriminatory use of peremptory challenges has been made:

the trial court should consider all of the relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose.

*Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712; *see also Tankleff v. Senkowski*, 135 F.3d 235, 249 (2d Cir.1998) ("courts should consider how many members of the cognizable racial group are in the venire panel from which the petit jury is chosen, the pattern of strikes against racial group jurors in the particular venire, the prosecutor's statements and questions during selection, as well as any other relevant circumstances."). *Batson* makes clear that the examples listed are merely illustrative, and, as noted in *Overton*, the Supreme Court has not specified what constitutes a prima facie showing under *Batson* beyond those examples. *Overton*, 295 F.3d at 278. However, contrary to respondent's argument, the fact that the Supreme Court has never expressly held that statistics alone may be sufficient to make out a prima facie case does not preclude a determination that the state court's decision was unreasonable. *See id.* *Batson* sets forth a broad principle that purposeful exclusion of jurors on the basis of race violates the Equal Protection Clause of the U.S. Constitution. *Id.* Accordingly, as the Second Circuit concluded in *Overton*, "statistics, alone and without more, can, in appropriate circumstances, be sufficient to establish the requisite prima facie showing under *Batson* .... [T]o hold otherwise would undermine the general antidiscrimination principle established by *Batson*." *Id.* at 278–79.

As emphasized in *United States v. Alvarado*, 923 F.2d 253 (2d Cir.1991) ("*Alvarado II*"), a case decided by the Second Circuit on direct appeal, in order to determine whether a challenge rate against a minority group constitutes a statistical disparity sufficient to support an inference of discrimination, the challenge rate must be examined in context. *Id.* at 255. The *Alvarado II* court held that "only a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination." *Id.* While *Alvarado II* makes clear that the "failure to exercise an available challenge against minority veniremen ... does not defeat a *prima facie* case," *id* at 256, such waivers are relevant to the statistical analysis. *See id.* at 255–56.

The *Alvarado* court in earlier proceedings rejected appellant's calculation of the peremptory challenge rate against minorities as 67 percent (four of six challenges used) in favor of a calculation taking waived challenges into account. *See U.S. v. Alvarado*, 891 F.2d 439, 444 (2d Cir. 1989) ("*Alvarado I*"), vacated on other grounds, *Alvarado v. U.S.*, 497 U.S. 543, 110 S.Ct. 2995, 111 L.Ed.2d 439 (1990). It observed: "since the prosecutor waived one challenge at a point where minority venire members were available for challenge, it is more pertinent to note that the challenge rate was 57 percent (four of seven) against all venire members and 50 percent (three of six) in the selection of the jury of twelve prior to the selection of alternates." *Id.; see also Barbara v. Goord*, No. 98–4569, 2001 WL 1776159, at *3 n. 2 (E.D.N.Y. Dec. 27, 2001) (noting that the Second Circuit has ruled that waived challenges should be included in calculating the percentage of minority challenges). Ultimately, in *Alvarado II*, the court compared the 57 percent challenge rate to the 29 percent minority popu-

lation of the Eastern District[1] and concluded that "a challenge rate nearly twice the likely minority percentage of the venire strongly supports a prima facie case under *Batson*." *Alvarado II*, 923 F.2d at 255–56.

The importance of developing the record to provide context for evaluating statistics was reiterated in *Overton.* The Second Circuit reversed the district court's grant of a writ of habeas corpus despite the prosecution's exercise of seven of ten challenges against African–Americans. *Overton*, 295 F.3d at 279–80. In making the *Batson* claim, Overton's trial counsel merely noted that by her "rough count" the prosecution had exercised seven of nine peremptories against blacks after the first two rounds of jury selection. *Overton v. Newton*, 146 F.Supp.2d 267, 271 (E.D.N.Y. 2001).[2] The trial judge rejected the claim summarily. Later that day, the judge identified the races of the members of the first two panels and whether each had been excused for cause, struck by use of a peremptory challenge or seated as a juror. *Id.* at 271. The *Batson* claim, which had been made before the racial makeup of the two panels had been established on the record and before jury selection was complete, was never renewed. *Overton*, 295 F.3d at 279. Noting that petitioner "[bears] the burden of articulating and de-

veloping the factual and legal grounds supporting his *Batson* challenge before the trial court," the Circuit held that "[b]ecause this was not done, the trial judge never confronted, and the trial record does not reveal, what the statistics would have shown at the conclusion of jury selection. If those statistics sufficiently established the inference that challenges were based on race, the court could then have implemented the *Batson* process to ensure that impermissible challenges would not be allowed." *Id.* Applying the deferential standard of review required on habeas, the Circuit held that "on th[e] record, the trial judge's refusal to implement *Batson*'s process for testing each questioned challenge midway in the process was [not] an unreasonable application of the *Batson* requirements." *Id.* at 280.[3]

█ This Court cannot conclude that the determination that petitioner failed to make a prima facie showing before the state trial court "involved an unreasonable application of" the principles of *Batson.* As in *Overton*, the state court decision need not be read as holding that statistics alone can never establish the requisite prima facie showing under *Batson.* *See Overton*, 295 F.3d at 279. Although the record reflects that defense counsel renewed her *Batson* claim as the basis for

1. Because the minority percentage of the venire was unavailable, the Second Circuit accepted the minority percentage of the population of the Eastern District as a surrogate. *See Alvarado I*, 891 F.2d at 444 n. 5; *Alvarado II*, 923 F.2d at 255–56.

2. As the district court correctly noted, the prosecution had in fact exercised seven of ten challenges against African–Americans. *Id.* at 271 n. 6.

3. The Second Circuit has concluded on habeas review that "where every black juror was subject to peremptory strike, a 'pattern' plainly exists" giving rise to an inference of dis-

crimination. *Harris v. Kuhlmann*, 346 F.3d 330 (2d Cir.2003); *see also Tankleff*, 135 F.3d at 249 (in case where full record not developed, "the fact that the government tried to strike the only three blacks who were on the panel constitutes a sufficiently dramatic pattern of actions to make out a prima facie case."). As articulated by the Court, "in highlighting a 100% pattern of the use of peremptory strikes against prospective black jurors, '[p]etitioner made out a prima facie showing of racial discrimination resulting from the prosecutor's pattern of peremptory strikes.' " *Harris*, 346 F.3d at 346 (quoting *Harris v. Kuhlmann*, 115 F.Supp.2d 326, 339 (E.D.N.Y. 2000)).

her motion for a mistrial after jury selection was complete,[4] defense counsel failed to articulate and develop the relevant information to place the number of peremptory challenges exercised against African–Americans in a meaningful context. Counsel merely stated, and reiterated when making the motion for a mistrial, that the prosecutor had exercised four out of five peremptory challenges against African–Americans. Some of the relevant statistical information can be gleaned from the voir dire transcript. However, counsel did not support her claim by making a complete record before the trial judge of the total racial composition of the panels, the number of African–Americans who were not peremptorily challenged by the prosecutor, and the number of African–Americans who actually sat on the jury. Moreover, counsel did not develop the argument that there was no reason for the challenges other than race, beyond reviewing the voir dire questioning of the jurors indicating that they all ultimately had said they could be fair. See People v. Childress, 81 N.Y.2d 263, 267–68, 598 N.Y.S.2d 146, 614 N.E.2d 709 (1993) (assertion that jurors indicated no reason why they could not be fair was insufficient to establish a prima facie case on the record because it "served only to highlight that the stricken jurors demonstrated no biases that would disqualify them for service or support a challenge for cause"). Thus, it was not unreasonable for the court to find that counsel failed to make out a prima facie case. Indeed,

counsel failed to meet her "burden of articulating and developing the factual and legal grounds supporting [the] Batson challenge before the trial court." Overton, 295 F.3d at 279. Accordingly, this Court finds no basis for habeas relief. See Copeland v. Walker, 258 F.Supp.2d 105, 123 (E.D.N.Y. 2003) (because "[a]s in Overton, petitioner did not address or call to the attention of the trial judge crucial information surrounding the statistics, such as the total racial makeup of the venire, the number of minorities who actually sat on the jury, and the number of minorities who were not challenged by the prosecutor," nor did he argue that the prosecutor had no reason for the challenges other than race, there was an insufficient basis for finding state court decision unreasonable).

On appeal, counsel did articulate various ratios, including that at the time the Batson claim was first made the prosecutor had exercised 80 percent of her peremptory challenges (four of five) to exclude 67 percent (four of six) of prospective African–American jurors. In addition, counsel noted that 31 percent of the qualified jurors (8 of 26 jurors remaining after jurors were excused for cause) at the end of round two were African–American. Thus, counsel argued, the 80 percent challenge rate and 67 percent exclusion rate of African–American jurors as compared to the 31 percent African–American pool of qualified jurors established a pattern sufficient to give rise to an inference of discrimination.[5] Appellate counsel also argued that the responses of those potential jurors that

---

**4.** By letter dated August 12, 2002 and at oral argument, counsel for petitioner argued that this case is distinguishable from Overton in part because petitioner's counsel renewed the claim as the basis for the motion for mistrial after eleven jurors, nearly the complete jury, had been seated. From the portion of the transcript petitioner's counsel has made available to this Court, it appears that the mistrial motion was in fact made at the conclusion of

jury selection. (See Tr. 328) (jurors sworn); (Tr. A89, 337) (motion for mistrial).

**5.** Petitioner's counsel urges the Court to accept its methodology of excluding individuals excused for cause before computing the minority percentage of the venire. Although the Court appreciates counsel's rationale that such jurors were not available for peremptory challenge, the Court notes that jurors excluded for cause were included by the district

were excluded were indistinguishable from those that were accepted and that the excluded jurors constituted a heterogeneous group apart from their shared race. These arguments were not made to the trial judge.

In any case, taking into account challenges that apparently were available and could have been exercised against African–Americans but were waived, consistent with *Alvarado I* and *Alvarado II*, the minority challenge rate at the time the *Batson* claim was first raised was 57 percent (four of seven). Two African–Americans were not challenged and were seated in the first round. At the time the *Batson* challenge was renewed during the second round, when five of eight (63 percent) peremptory challenges had been exercised against African–Americans, an additional African–American had been seated. Recalculating the minority challenge rate to take account of challenges that could have been exercised, the challenge rate drops to 45 percent (five of eleven). Given that the pool of jurors during the first two rounds appears to have been 31 percent African–American, the disparity is not sufficiently dramatic to permit this Court to conclude that the state court's decision was objectively unreasonable. *Compare Collado v. Miller*, 157 F.Supp.2d 227, 234 (E.D.N.Y. 2001) (absent any other indicia of bias, prosecution's use of 39 percent (7 of 18) of its challenges to strike allegedly Hispanic jurors from a 25 percent Hispanic population insufficiently disparate to conclude state court erred in finding no prima facie case) *with Greene v. Travis*, No. 02–6016, 2003 WL 23198761, at *8–9 (E.D.N.Y. Dec. 2, 2003) (prima facie pattern demonstrated where minority jurors constituted 43 percent of potential jurors and "at the time of the *Batson* challenge, the prosecutor had used [100] percent of her peremptory strikes to remove African–American and Hispanic jurors").

In addition, although this Court joins the Appellate Division in noting its "disapproval of the manner in which the Supreme Court conducted the voire dire," *Harrison*, 708 N.Y.S.2d at 434, much of the trial court's discussion of *Batson* in denying the motion for a mistrial can be interpreted as an expression of its "refusal to implement *Batson* 's process for testing each questioned challenge midway. in the process." *Overton*, 295 F.3d at 280. Such a refusal was held not to be an unreasonable application of *Batson* on the record in *Overton*. *Id.*

### Conclusion

For the reasons stated above, the application for a writ of habeas corpus is denied, and the petition is dismissed. Nevertheless, a certificate of appealability shall issue. *Miller–El v. Cockrell*, 537 U.S. 322, 337–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). The Clerk of the Court is directed to close this case.

SO ORDERED.

---

courts in the calculations in *Overton*, 146 F.Supp.2d at 271 & 276 (11 of 32 venirepersons, including one struck for cause, were African–American) and *Greene v. Travis*, No. 02–6016, 2003 WL 23198761, at *9 (E.D.N.Y. Dec. 2, 2003) (43 percent of jurors in first two rounds were minorities, including those excused for cause). Moreover, the *Alvarado* court, in accepting the minority percentage of the population of the Eastern District as a proxy, accepted a number which would reflect the composition of the panel prior to challenges for cause. The record does not permit this Court to compare the methodologies because it does not include racial or ethnic background information relating to jurors excused for cause.